## CARBON STEEL COMPANY *v.* LEWELLYN, COLLECTOR OF INTERNAL REVENUE FOR THE TWENTY–THIRD DISTRICT OF PENNSYLVANIA.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 535.   Argued January 12, 1920.—Decided March 1, 1920.

The rule of strict construction will not be pressed so far as to reduce a taxing statute to a practical nullity by permitting easy evasion. P. 505.

The Munitions Manufacturer's Tax payable under the Act of September 8, 1916, c. 463, § 301, 39 Stat. 780, by persons "manufacturing" shells, etc., and computed as an excise of 12½ per cent. upon the net profits from the sale or disposition of such articles "manufactured"

within the United States, applies to the profits derived from sales of shells under contract to the British Government by one who performed the manufacture in its early stages only and had the subsequent operations performed by subcontractors, furnishing them the steel so partly manufactured, with some of the other materials, retaining ownership of materials when furnished, and control of the operations, and owning the shells when completed. P. 503.
This liability is not affected by the fact that the subcontractors paid a similar tax on their profits. P. 506.
258 Fed. Rep. 533, affirmed.

THE case is stated in the opinion.

*Mr. H. V. Blaxter*, with whom *Mr. Frederick DeC. Faust* and *Mr. Henry O'Neill* were on the brief, for petitioner.

*Mr. Assistant Attorney General Frierson* for respondent.

MR. JUSTICE McKENNA delivered the opinion of the court.

Petitioner brought this action against Lewellyn who is Collector of Internal Revenue for the 23rd District of Pennsylvania, to recover the sum of $271,062.62 with interest from December 29, 1917, paid to him, under a demand made by him, as Collector, for an excise tax assessed under § 301 of Title III of the Act of September 8, 1916, c. 463, 39 Stat. 780, known as Munitions Manufacturer's Tax.

Petitioner made a verified return under protest, reciting its belief that the tax should be abated for the following reasons: (1) Petitioner did not manufacture munitions; (2) the munitions taxed were manufactured by certain independent contractors; (3) the profit derived by petitioner was from the sale of the munitions, not from their manufacture.

The tax was not abated and petitioner paid it under protest.

The facts are stipulated. Petitioner, through its president, who went to England, entered into three contracts with the British Government dated, respectively, January 26, September 29, and October 7, 1915, for the manufacture and delivery f. a. s. New York, of a certain number of high explosive shells.

The work to complete the shells consisted of the following operations: (1) Obtaining suitable steel in bar form; (2) cutting or breaking the bars to proper length; (3) converting the bars or slugs into a hollow shell forging by means of a hydraulic press; (4) turning the shell upon a lathe to exact dimensions; (5) closing in one end of the forging to form the nose of the shell; (6) drilling out the case of the shell and inserting a base plate; (7) threading the nose of the shell and inserting the nose bushing and inserting in the nose bushing a wooden plug to protect the thread thereof; (8) cutting a groove around the circumference of the shell and inserting therein a copper driving band and turning the band to required dimensions; (9) varnishing, greasing and crating the completed shell.

Petitioner was not equipped, nor did it have facilities, for doing any of the described work except the manufacture of steel suitable for the shells in bar form, and, therefore, to procure the manufacture of the shells it did certain work and entered into numerous contracts in relation to the various steps in making a completed shell.

These steps are not necessary to give. The question in the case is not a broad one and all of the details of the stipulation are not necessary to its decision. The essential elements of fact we have given and whether they bring petitioner within the Munitions Tax Act we shall proceed to consider.

The act is as follows: "Sec. 301. (1) That every person manufacturing . . . ; (c) projectiles, shells, or torpedoes of any kind . . . ; or (f) any part of any of the articles mentioned in . . . (c) . . . ; shall pay

for each taxable year, in addition to the income tax im-
posed by Title I, an excise tax of twelve and one-half per
centum upon the entire net profits actually received or
accrued for said year from the sale or disposition of such
articles manufactured within the United States: . . ."

The act is explicit in its declaration; perplexity and
controversy come over its application. One must be a
"person manufacturing" to incur the tax, but who is to be
regarded as such person in the sense of the act? or to put
it another way, when is "manufacturing" (the word of the
act) done, and when is "manufactured" (the word of the
act) attained? In elucidation of the words, the specifica-
tions enumerate nine operations to produce a shell, that
is a completed shell (except for explosive charge and
detonating device), such as petitioner contracted to de-
liver to the British Government. And all of the opera-
tions are asserted to be necessary and all must be per-
formed seemingly by the same person in order that he
may be designated as a "person manufacturing." We
put aside for the purpose of testing the contention the
provision of the act making a person manufacturing "any
part of any of the articles mentioned" subject to "a tax."

The contention reduces the act to a practical nullity on
account of the ease of its evasion. Besides, petitioner
minimizes what it did. It was the contractor for the
delivery of shells, made the profits on them and the
profits necessarily reimbursed all expenditures on account
of the shells. It was such profits that the act was intended
to reach—profits made out of the war and taxed to defray
the expense of the war. Or, as expressed by the Court of
Appeals, Congress "felt that the large abnormal profits
incident to these war contracts created a remunerative
field for temporary taxation." Petitioner, it is true, used
the services of others, but they were services necessary to
the discharge of its obligations and to the acquisition of
the profits of such discharge. And petitioner kept control

throughout—never took its hands off, was at pains to express the fact, and retained its ownership of all of the materials furnished by it, and the completed shell belonged to it until delivered to the British Government. And further, the steel furnished by it was advanced above a crude state—advanced to slugs. The nicking by an outside company we consider of no consequence, for after nicking they were re-delivered to petitioner and by it "broken or separated" into slugs.

And petitioner supplies its respective subcontractors with other materials—"transit plugs," "fixing screws," and "copper tubing." It is, of course, the contention of petitioner that this was furnishing, not *manufacturing*, and that the literal meaning of words can be insisted on in resistance to a taxing statute. We recognize the rule of construction but it cannot be carried to reduce the statute to empty declarations. And, as we have already said, petitioner's contention would so reduce it. How universal must the manufacturing be? Will the purchase of an elemental part destroy it? And how subsidiary must the work of the subcontractor be not to relieve the contractor—take from him the character of a "person manufacturing"? And such is the tangle of inquiries we encounter when we undertake to distinguish between what a contractor to deliver a thing does himself and what he does through others as subsidiary to his obligation.

It is after all but a question of the kind or degree of agency—the difference, to use counsel's words, between "servants and general agents" and "brokers, dealers, middlemen or factors." And this distinction between the agents counsel deems important and expresses it another way as follows: "'Every person manufacturing' means the person doing the actual work individually, or through servants or general agents, and that the ownership of the material worked upon does not alter this meaning of the word."

We are unable to assent to this meaning of the word. It takes from the act a great deal of utility and makes it miss its purpose. Of course it did not contemplate that a "person manufacturing" should use his own hands—it contemplated the use of other aid and instrumentalities, machinery, servants, and general agents, availing thereby of the world's division of labor; but it contemplated also the world's division of occupations, and, in this comprehensive way, contemplated that all of the world's efficiency might be availed of, and, when availed of for profits, the latter could not thereby escape being taxed. And where, indeed, was the hardship of it? The tax was on profits and measured by them.

It is, however, alleged, and the stipulation shows, that the subcontracting companies paid a tax on their profits and profits were testified to be the difference between what was paid the subcontracting companies for the work and their cost in doing it. And it thus appears, it is urged, that petitioner has been taxed upon the theory that it manufactured the shells and the contracting companies "have been taxed for actually performing all the manufacturing necessary to complete the same shells."

But it is a sufficient answer to say that the tax here in issue is the tax on the profits of the petitioner, not on the profits of the subcontractors. The question whether such subcontractors were correctly assessed concerns them and not the petitioner who is resisting a tax on the profits actually made by it and none other.

We consider further discussion unnecessary.

*Judgment affirmed.*


MR. JUSTICE DAY and MR. JUSTICE VAN DEVANTER dissent.