## BOLLES v. EDWARDS, Internal Revenue Collector.

(Circuit Court of Appeals, Second Circuit. April 28, 1924.)

No. 277.

1. **Internal revenue ⊜⥌9—Wet picric acid, sold for war purposes, held an "explosive" within Munition Manufacturer's Tax Act.**

   Wet picric acid, in which 10 per cent. of water was left in the process of manufacture to insure safety in carriage. and which required drying out only to render it effective as a high explosive, sold to foreign governments for military purposes during the war, *held* an "explosive," within the meaning of Internal Revenue Act Sept. 8, 1916, § 301 (Comp. St. § 6336¼b), and the manufacturer subject to munition manufacturer's tax thereunder.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Explosive.]

2. **Internal revenue ⊜⥌9—Manufactured article, within the taxing statute, must be so far completed as to be serviceable for the purpose intended.**

   The fundamental idea of a manufactured article, to come within the purview of a taxing statute, is that it must be so nearly completed as to be serviceable for the purpose for which it was designed.

In Error to the District Court of the United States for the Southern District of New York.

Action by John A. Bolles, as receiver of the American Synthetic Dyes, Inc., against William H. Edwards, Collector of Internal Revenue for the Second District of New York, to recover taxes paid under protest under the Revenue Act of September 8, 1916 (39 Stat. 780). Judgment for defendant. Plaintiff appeals. Affirmed.

For opinion below, see 290 Fed. 1018.

Carson & Conrad, of New York City (A. C. Carson, W. Davis Conrad, and John Hunter, all of New York City, of counsel), for plaintiff in error.

William .Hayward, U. S. Atty., of New York City (Thomas J. Crawford, Asst. U. S. Atty., of New York City, and Nelson T. Hartson, Sol. of Internal Revenue, and John B. Milliken, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for defendant in error.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge [1] The American Synthetic Dyes, Inc., was a Virginia corporation, and contracted with the Imperial Russian government and the republic of France, during the World War, for the manufacture and sale of 14,000,000 pounds of picric acid. It realized during the year 1916 a net profit on these transactions amounting to $1,823,270.24. The government has assessed and collected a tax of 12½ per cent. on this net profit, amounting to $227,908.-78 with interest. This tax was assessed upon the claim that the picric acid so manufactured and sold is an explosive, within the purview of section 301 of title 3 of the Revenue Act of 1916 (39 Stat. 781 [Comp. St. § 6336¼b]). It was sold, concededly, through agencies

to the governments of France and Russia during a war period, and, while there is no direct evidence, the circumstances justify the claim of the government that it was for war purposes. The statute imposing the tax is a revenue measure and provides (section 301):

"That every person manufacturing (a) gunpowder and other explosives, excepting blasting powder and dynamite used for industrial purposes, * * * shall pay for each taxable year, in addition to the income tax imposed by title I, an excise tax of twelve and one-half per centum upon the entire net profits actually received or accrued for said year from the sale or disposition of such articles manufactured within the United States: Provided, however, that no person shall pay such tax upon net profits received during the year nineteen hundred and sixteen derived from the sale and delivery of the articles enumerated in this section under contracts executed and fully performed by such person prior to January first, nineteen hundred and sixteen."

It is conceded that picric acid, so sold under these contracts, contained 10 per cent. moisture and further that dry picric acid—i. e., picric acid containing less than 1 per cent. of water—is an explosive under section 301 of the act. A tax on dry picric acid is conceded to come within the purview of the taxing statute. Much testimony was adduced at the trial as to the chemical properties of picric acid, and its behavior when dry and when there is the presence of 10 per cent. moisture. Picric acid is the product of the nitration of phenol or carbolic acid. In manufacturing it, the American Synthetic Dyes, Inc., mixed phenol and sulphuric acid, and to the resulting product, called phenol sulphenic acid, added water in quantity. The mixture was then treated with nitric acid, producing a yellow scum, which is picric acid. The crystals were then transferred to tanks and more water added, to cleanse the substance of all liquid acids and impurities. The upper layer of water, containing the liquid acids, was then syphoned off, and all but 10 per cent. of the water removed from the picric acid by means of centrifuges. The centrifuges were stopped when this percentage was reached, and the picric acid was transferred to bins and later packed in paraffin lined barrels for shipment. The moisture content, although held as close to 10 per cent. as possible, varied a trifle above or below that percentage. The foreman in charge of the centrifugating process judged the moisture content by the length of time the centrifuges were in operation. The record discloses that picric acid was used extensively during the war as an explosive by the French and Russian governments. For this purpose, picric acid is desired in a dry state. It is unsafe to ship while dry, and the practice is to leave the moisture content, so as to avoid exploding while in shipment. To dry it requires a drying process of from 36 to 72 hours. The process is merely exposing it to the atmosphere under proper atmospheric conditions, when it will dry down to a point when it may be used as an explosive. Dry picric acid is extremely sensitive to shock and friction. The presence of water has a desensitizing effect on the acid crystals.

The shipments in question to the French and Russian governments were made to the military department of those governments. Elaborate provision was made for inspection and testing. The packing was carefully prepared, so as to prevent the evaporation of moisture. The

only question presented on this appeal is whether picric acid containing 10 per cent. water is an explosive, within the meaning of the act. If so, the tax was properly assessed, and was payable. The purpose of this taxing statute was to reach profits derived from the business of manufacturing and selling war munitions. It was intended that the government might avail itself of such profits, and the tax was to be measured by the profits so derived. Carbon Steel Co. v. Lewellyn, 251 U. S. 501, 40 Sup. Ct. 283, 64 L. Ed. 375. The contracts made with the governments in question indicate a vast quantity of acid, running into large figures. Time was the essence of the contracts, and apparently substantial profits were provided for. They were made with the military authorities, indicating clearly that the uses to which the picric acid was to be put were military in their nature, and were not to be used for the ordinary industries of peace times. It was to be used as an explosive or munition of war.

Whether wet or dry, it is manufactured by the same process. The yellow scum formed by the chemical reaction resulting from the treatment of the phenol sulphenic acid with nitric acid constitutes picric acid. The chief function of the water in the manufacturing process appears to be the purification of the picric acid, by removing all foreign impure acids created in the course of manufacture. There is no chemical association or combination of the 10 per cent. water retained with the picric acid crystals, and when the water is applied it is conceded to be completely manufactured. The argument of the plaintiff in error proceeds upon the claim that the right to recover is based upon the behavior of the picric acid when wet with 10 per cent. or more of water as being different from the behavior when dry; that is to say, it is explosive when dry, and not so when wet. But the picric acid crystals, which is the explosive substance, are found in wet and dry picric acid. The contracts expressly provided it to be made on a net dry weight basis, and the fact is not controverted that with the 10 per cent. moisture it could be dried and made available as an explosive by merely exposing the acid to a dry atmosphere. Merely providing for moisture or water to guard against explosion during shipment does not change the character of the manufactured product. United States v. Ætna Explosives Co., 256 U. S. 402, 40 Sup. Ct. 513, 65 L. Ed. 1013; Boericke & Runyon Co. v. United States (C. C.) 126 Fed. 1018; United States v. Kuttroff Pickhardt Co. (C. C.) 147 Fed. 758, affirmed 154 Fed. 1004, 83 C. C. A. 679.

[2] It is argued that picric acid might be used in manufacture as a dyestuff. However, the record discloses, when used as a dye, picric acid has a much greater dilution than 10 per cent. water. But the purpose of the manufacture and use here is easily inferable, and indeed plain. There is some testimony of an expert character that picric acid containing 10 per cent. water can be completely and effectively exploded by commercial detonators. The question is presented, when is "manufacturing" done, and when is "manufactured" attained? Carbon Steel Co. v. Lewellyn, supra. In Worth Bros. v. Lederer, 251 U. S. 507, 40 Sup. Ct. 282, 64 L. Ed. 377, involving the same statute, the plaintiff made the steel and did the forgings on steel shell bodies under

an order of the Midvale Steel Company, to enable the latter to carry out a contract it had with the French government for certain explosive shells. The steel was made and the forgings done by the plaintiff in accordance with specifications required by the French government. The forgings so sold were 80 per cent. short of the point where they could be related to or combined with any other component of the shell structure. The forging had to be subjected by the steel company to 29 additional separate and distinct manufacturing processes before it was made into a complete shell body. The plaintiff contended that the article manufactured and sold by it was not a shell, or part of a shell, within the meaning of the law, and that the term "part" meant a substantially completed part, a part so far advanced in construction that without further manufacturing it could be incorporated into a completed shell. In answering the argument, the court said:

"Congress did not intend to subject its legislation to such artificialities, and make it depend upon distinctions so refined as to make a part of a shell not the taxable 'part' of the law. Besides, petitioner understates its work. It did not deliver raw material to the Midvale Company. Certain processes had been performed on the material, giving it a shape adapted to its destination. It was made cylindrical, hollow, with one end closed. It was rough, it is true, but an advance upon the raw material."

Congress, in dealing with the imposing of taxes as the main object, and with the work done as a mere incident to aid in determining the tax, did not regard the quantum of the work done as material. The crucial question is not the quantum of the manufacture measured by the steps, but the fact of manufacture resulting in profits. The fundamental idea of a manufactured article is that it must be so nearly completed as to be serviceable for the purpose for which it was designed. Forged Steel Wheel Co. v. Lewellyn, 251 U. S. 513, 40 Sup. Ct. 285, 64 L. Ed. 380.

In the instant case, it cannot be successfully argued that the picric acid manufactured by the American Synthetic Dyes, Inc., was no more than a material entering into and used as a component part of the manufacture of the explosive. The debates in Congress do not support the claims of the plaintiff in error. The product manufactured was clearly an explosive within the meaning of the act. Dayton Brass Co. v. Gilligan (C. C. A. Ohio) 277 Fed. 227. It is known to be one of the most violent and commonly used explosives employed extensively during the recent World War. We regard this result as consistent with the manifest and expressed intention of Congress.

Judgment affirmed.