OPINION OF THE COURT
Evans V. Brewster, S.
In this discovery proceeding, petitioner as executrix and sole beneficiary of decedent’s estate requests that the court fix the value of decedent’s shares of stock and direct the respondent corporation to pay to petitioner the purchase *1089 price of decedent’s shares in the corporation. The petition alleges: (1) that the decedent was a party to a stockholder’s agreement among the respondent corporation, his brother and him; (2) the corporation exercised its option to purchase the stock of the decedent; (3) the book value of decedent’s shares remains undetermined.
The answer and counterclaim to the petition admits that the decedent was a shareholder in the corporation and a party to the agreement and that the company had exercised its option to purchase decedent’s stock but denies that the book value of decedent’s shares in the corporation had not been determined. As affirmative defenses and a counterclaim, the corporation alleges that the decedent, an officer, director and shareholder of the corporation, knew of the corporation’s statement with respect to its book value.
A hearing on the framed issues was held on Juné 7, 8 and 9,1982. The issues presented for determination were: (1) Is the book value of decedent’s 40% interest in the respondent corporation pursuant to a stockholder’s agreement dated August 2,1971 the sum of $126,595.26 of which no part has been paid or is the book value of decedent’s 40% interest $106,763.20?; (2) Under the stockholder’s agreement of August 2,1971, must the death benefits of $100,000 paid to petitioner under the contributory group employee benefit plan providing death benefits to employee beneficiaries be applied against the book value to be paid for the decedent’s stock? Petitioner (1) denies that the contributory group employee plan under which decedent’s beneficiary received insurance proceeds is the life insurance contemplated by the stockholder’s agreement and (2) denies that the proceeds of such plan may be used by respondent corporation for buy-out purposes.
Petitioner further alleges that the compilation report prepared by the accountants for the corporation which presented financial information obtained from Edwin Sirotta, the majority stockholder, was in error in four balance sheet items resulting in an undervaluation of the book value and of decedent’s shares thereof. Those four items are: (1) failure to accrue interest income receivable in the valuation of Treasury bills; (2) accounts receivable; (3) accrued expenses; (4) inventory. It is the contention of *1090 the petitioner that as respondent is a manufacturing corporation, proper accounting practice would require that the balance sheets be maintained in accordance with the full absorption method of accounting required by the Internal Revenue Code for manufacturing companies. Respondent denies it is a manufacturing corporation and therefore denies that its inventory is undervalued. It also asserts that the petitioner is bound by the same doctrines of estoppel and ratification which would have bound the decedent. No issue is taken with the axiom that upon the death of a stockholder, his estate becomes the holder of stock owned by him at his death. (Bailey v Hollister, 26 NY 112.) Also, no issue arose whether a corporation, subject to any restrictions contained in its certificate of incorporation, may purchase its own shares, or redeem its redeemable shares, out of surplus except when currently the corporation is insolvent or would thereby be made insolvent (Business Corporation Law, § 513).
Initially, the court reaffirms its jurisdiction over the subject matter of proceedings involving enforcement of a shareholder’s agreement (Dunham v Dunham, 40 AD2d 912; Matter of Breitman, 114 Misc 2d 248; Matter of Piccione, 57 NY2d 278).
Uncontradicted testimony at the hearing showed that the respondent corporation is a close corporation, engaged in the business of purchasing, grinding and selling apricot pits for industrial uses. The apricot pits are ground and bagged for the company by an independent corporation located in Mount Pulaski, Illinois. The finished product is received by the respondent at its Brooklyn office and warehouse. The business was founded by Bernard Sirotta, the father of Edwin and Milton. After the death of their father and until July 8, 1971, the respondent corporation was run by Edwin and Milton as a partnership. On that date the company was incorporated. Edwin was named president and received 60% of the company’s shares. The decedent herein was named vice-president and treasurer and received 40% of the stock. Sylvia Sirotta, Edwin’s wife, was named secretary. These three became the directors of the corporation.
On August 7, 1971 the company, Edwin and Milton *1091 entered into a stockholder’s agreement which provided, inter alia, for the purchase and sale of the shares of the first to die by the surviving shareholder or the company. The pertinent provisions of the agreement are as follows:
“l.(a) Each stockholder shall not sell, assign, transfer, pledge, encumber, or, in any other way, dispose of any or all of the shares of stock of the Corporation that may now or hereafter be held or owned by him, nor shall any of such shares of stock be transferable until he shall have first offered for sale all óf the shares of stock of the corporation to the other stockholder * * *
“3. Upon the death of any stockholder, the other stockholder shall purchase the shares of stock of the Corporation owned or held by the stockholder so deceased at the time of his death as though an offer to sell had been made by such stockholder at the date of death under paragraph T’ of this agreement and such other stockholder had accepted such offer so made within the time allowed therefor and the terms, provisions and conditions of this agreement shall, mutatis mutandis, apply to and bind the personal representative or representatives of such deceased stockholder.
“4. Anything herein contained to the contrary not withstanding, if an offer shall be made to any stockholder * * * the offerer and offeree shall forthwith notify the Corporation thereof in writing and the corporation shall, if its surplus is sufficient, have the option of accepting said offer and of acquiring the stock upon the terms herein set forth * * *
“5. The purchase price hereunder of shares of stock of the Corporation shall be the book value of such shares as shown by the annual fiscal year balance sheet of the Corporation next preceding the date of the offer * * *
“7.(h) For the purpose of this agreement, the proceeds of any and all life insurance policies received or receivable on the life of any deceased stockholder and the cash surrender value of any other life insurance policies held by the Corporation on the life of any stockholder shall not be deemed an asset of the Corporation.
“8.(a) The purchase price for the aforesaid stock shall be paid as follows: Twenty-five (25%) percent thereof in cash *1092 and the balance by the execution and delivery of thirty-six promissory notes in equal amounts bearing interest at six (6%) percent per annum payable monthly seriatim * * *
“8.(c) Notwithstanding the provisions of Subd. (a) of this paragraph, in the event that the corporation shall carry life insurance, upon the life of the deceased stockholder, the proceeds thereof shall be applied against the purchase price and the balance, if any, between the purchase price and said proceeds shall be payable over a period of three years in the manner prescribed under Subd. (a) hereof.”
Decedent died on February 19, 1981. On March 4, 1981, pursuant to paragraph 4 of this agreement, the president, Edwin M. Sirotta, notified the petitioner executrix stockholder in writing that the corporation was exercising its option of acquiring the stock of the deceased stockholder, the decedent herein. The respondent has applied the proceeds of its group term life insurance policy in the amount of $100,000 towards the purchase price of decedent’s shares and as a credit to the company. It is this policy, not in effect at the time the buy-out agreement was entered into, that the petitioner claims was wrongfully credited by the respondent toward the book value of the shares owned by decedent.
The buy-sell agreement, in effect at decedent’s death, appears to be a form of agreement wherein the purchasers of the deceased stockholder’s shares of stock could be either the surviving stockholder or the corporation itself. In either event, it mandates the purchase by the surviving shareholder, subject to the optional purchase by the corporation if its surplus is sufficient. This mandatory purchase of a shareholder’s shares benefits an estate in that the estate of the deceased shareholder has a guarantee that its shares will be liquidated. It also benefits the corporation in that the surviving shareholder becomes the sole owner of the business with no interference from the deceased shareholder’s estate and a restraint is placed on the transfer of shares to outsiders. Nevertheless, the many ambiguities in the contract compelled the court to consider extrinsic evidence on the issues presented herein.
A threshold issue is whether the respondent corporation is to be included within the definition of manufacturer. The *1093 term “manufacturing” has been generally defined, for tax statute purposes, as the production, whether by hand or machinery, of a new and different article or product from raw or prepared materials, resulting in a product having a distinctive name, character and use. Some further treatment in order to fit it for its ultimate use does not necessarily preclude the production process from being classified as manufacturing (Ann., 17 ALR3d 7, 20, § 2; United States v Meier & Co., 136 F 764).
Although respondent contends that the apricot pits are actually ground and bagged for the company by an Illinois processor, a producer or dealer of a product may be regarded as a manufacturer although some or all of the actual manufacturing or processing operations are performed by another under a contractual agreement (Ann., 17 ALR3d 7, supra; Carbon Steel Co. v Lewellyn, 251 US 501; Vinal v Peterson Mortuary, 353 F2d 814).
Moreover, section 471 of the Internal Revenue Code (US Code, tit 26, § 471) gives the Secretary broad authority to prescribe rules for inventories that will both clearly reflect income and conform to the best accounting practice in the trade or business. The Treasury exercised this authority in September of 1973, issuing Treasury Regulation 1.471-1 (26 CFR 1.471-1) which requires manufacturers to use the full absorption method of inventory costing.
Petitioner’s accountant testified that the respondent is a manufacturer; that its balance sheets were undervalued; and that the full absorption method should have been utilized but was not.
The compilation report of the accountants prepared by the respondent was limited to presenting in the form of financial statements, information that is the representation of management. No audit or review of the accompanying financial statement transpired and no opinion or any other form of assurance on them was expressed. Nevertheless testimony of the respondent’s accountant who prepared the compilation upheld petitioner’s argument that if the company is deemed to be a manufacturer, the full absorption method should be applied in connection with this business. There being no further proof offered by the *1094 respondent on this issue which rebuts this accountant’s testimony the court determines that the respondent is a manufacturing corporation and thus must comply with the full absorption method of valuation.
The next issue is the valuation of the shares owned by the decedent at the time of his death in accordance with the full absorption method. The buy-sell agreement states in paragraph 5 that the purchase price shall be the book value of the shares as shown by the annual fiscal year balance sheet of the corporation next preceding the date of the offer. Petitioner asserts that the balance sheet undervalues the book value of the shares, in that certain direct and indirect costs mandated to be taken into consideration when employing the full absorption method of accounting are not shown in the balance sheets. Presumably, the more costs incurred, the greater the inventory and the book value of the shares. While petitioner used a 75% factor to determine the value of the costs that should have been included using the full absorption method, this factor was disputed by the respondent.
There is no single authoritative source used to determine accepted accounting practices (Sellin, Attorney’s Handbook of Accounting [3d ed]). As noted above, petitioner disputes four balance sheet items.
In reference to the first issue, whether interest income receivable on the Treasury bills purchased by the corporation should be recognized when received as distinguished from being notable recognized when earned, the Internal Revenue Code specifically treats obligations of the United States issued on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue. The amount of the discount does not accrue at purchase but only when the obligation is paid at maturity, sold or otherwise disposed of (US Code, tit 26, § 454, subd [b]). “This rule applies regardless of the method of accounting used by the taxpayer” (26 CFR 1.454-1 [b]). Therefore the inventory was not undervalued in this respect.
Next, the petitioner alleges that the books of the corporation demonstrated that some goods shipped in June were not billed until July so that the invoices for those goods did *1095 not appear as accounts receivable on the balance sheet ($9,662). Yet the uncontradicted testimony was that $5,300 worth of invoices were treated the same way in 1978 and $9,700 worth in 1979. Since the decedent accepted this method of billing during his lifetime, his acceptance is binding upon the executor. The court finds as credible the testimony of a witness for the respondent who observed the decedent as he viewed financial reports of the corporation.
Petitioner challenges the payment to Edwin Sirotta of a $25,000 bonus in September, 1980, after the close of the fiscal year on June 30, 1980. The balance sheet as of June 30, 1980 lists only accrued expenses, without specifying officer’s salary accrued. Although no evidence was offered that this buried “bonus” was brought to the attention of Milton Sirotta at any time or approved by him (apparently this bonus was declared by Edwin to Edwin without board of directors’ action) and not in the same proportion as the ownership of the corporation, this was consistent with the balance sheets for the years 1978 and 1979 which were accepted by the decedent. This accrued expense therefore appears to be a proper deduction in the 1980 period, rather than a salary payment for the fiscal year 1981.
Thirdly, the petitioner alleges that the decedent’s share of the book value of respondent should be paid to petitioner without any setoff. That is, that the insurance proceeds paid by the Guardian Life Insurance Company of America to petitioner as the beneficiary of decedent’s group employee benefit life insurance policy should not have been applied against decedent’s share of the book value of decedent’s stock. Respondent contends that this policy was credited against the value of decedent’s shares as it constitutes “the insurance” on the life of a stockholder contemplated by paragraph 8(c) of the stockholder’s agreement. Petitioner offered proof that custom and practice in the insurance industry does not recognize the use of group employee benefit life insurance for corporate “buy-back” purposes and that under sections 79, 162 and 264 of the Internal Revenue Code (US Code, tit 26) respondent could have deducted the premiums paid for the group benefit life insurance policy only if respondent was not the direct or *1096 indirect beneficiary of the proceeds of the policy. Petitioner further urges that the respondent corporation never secured the type of insurance contemplated by paragraph 8(c) of the buy-sell agreement, that is, insurance providing the corporation, as beneficiary of a policy on the life of a shareholder, with funds with which to effectuate a “buyback” of the deceased shareholder’s stock.
The insurance policy was obtained in 1973 and was the customary group employee life insurance insuring the lives of its four employees of whom the decedent was one. The death benefits in the amount of $100,950 were paid to the named beneficiary of the decedent, the executrix herein. In 1974, when the coverage for the decedent was increased from $50,000 to $100,000, the cost of the additional payment of premium for the additional coverage was charged by respondent as income to decedent and he paid income tax on the additional income so charged to him. The respondent argues that the category of life insurance includes various subcategories, e.g., group life insurance, buy-out insurance, term insurance purchased by an individual, etc., and that the tax consequences of the insurance are not dispositive of the issue presented to this court.
No authority has been found which states that the use of group life insurance to fund a shareholder’s agreement vitiates the express insurance provision in the contract. While authorities warn against the use of group life insurance to fund a shareholder’s agreement for tax reasons (Institute for Business Planning Inc., Closely Held Business, § 7703.2; Tax Facts on Life Insurance, National Underwriting Company [1981 ed], Q & A, 67), the Insurance Law only refers to group policies covering 10 or more employees. Nevertheless, authorities consistently speak of insurance policies where the corporation is the beneficiary on the life of the stockholder. (Hull, Stock Purchase Agreements in Estate Planning [2d ed].) Here the widow, not the corporation, is the beneficiary of the policy the corporation wishes to credit against the purchase price of the shares of stock owned by decedent. While the premiums paid by an employer for group term life insurance on the lives of employees are deductible (US Code, tit 26, § 162, subd [a]; 26 CFR 1.264-1; Rev Rule 56-400, 1956-2 CB 116), no *1097 deduction will be allowed for the cost of coverage if the employer is directly or indirectly a beneficiary under the policy. (US Code, tit 26, § 264, subd [a].) As the corporation deducted its premium payments for the first $50,000, it could not have intended the proceeds to be used to discharge its obligation to redeem the stock as it would then be an indirect beneficiary and should not now be heard to claim that this was the same policy contemplated by paragraphs 7(h) and 8(c) of the buy-sell agreement. Although the attorney-draftsman testified for the respondent, he was neither examined nor cross-examined as to the intention of the parties at the time of execution of the contract.
Other evidence also supports the conclusion that the group life insurance policy was not “the” life insurance policy contemplated by the agreement. Paragraph 1(a) of the agreement provides that each shareholder must offer for sale his shares of stock to the other stockholder. In such event, the corporation would not apply insurance proceeds to purchase the stock of a shareholder who died. Paragraph 3 of the agreement provides that on a shareholder’s death, the other stockholder, not the corporation, shall purchase the shares while paragraph 4 provides that the corporation is to be notified in writing of an offer made to any stockholder. Thus, life insurance could not have been intended to fund the agreement unless the corporation elected to purchase the stock upon the death of a stockholder. This could only be done if its surplus was sufficient.
The group life insurance policy covered not only the signatories of the stockholder’s agreement but also other corporate employees. The inclusion of other employees as insured named in the group life insurance policy is more consistent with an employee benefit than a vehicle for satisfying a deceased stockholder’s obligations under an agreement which involved only one other employee.
Paragraphs 7(h) and 8(c) are construed to relate to life insurance policies which are owned by the corporation and in which the corporation is named as beneficiary. The evidence presented does not support the application of the proceeds of the group life insurance policy coverage of the decedent, to the purchase price of the stock.
*1098 Therefore, the proceeds of the Guardian Life policy may not be credited to the purchase price for decedent’s shares. As insufficient proof was submitted on the value of the inventory applying the full absorption method, a further hearing will be held to receive additional evidence to establish the inventory and book value of the decedent’s stock interest. The hearing will be held at 9:30 a.m. on March 7, 1983 upon the single issue.