ALEXANDER SPRUNT & SON, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 38408. Promulgated November 4, 1931.

600

*J. Marvin Haynes, Esq.*, and *C. J. McGuire, Esq.*, for the petitioner.

*B. M. Coon, Esq.*, and *C. R. Marshall, Esq.*, for the respondent.

OPINION.

MARQUETTE: 1. The first issue has been somewhat beclouded by the different positions taken by the petitioner in the pleadings and in its brief. In the preliminary statement of this report, we have quoted verbatim under (1) the assignment of error as set forth in the petition. In the statement of facts contained in the petition, the petitioner alleged as follows:

These commissions were taken as a deduction from gross income in the 1923 tax return filed by the petitioner. The respondent has in its 60-day letter disallowed these commissions as a deduction from gross income and has stated in its 60-day letter the following reason for the disallowance:

" This item represents commissions earned through your Bremen agency and represents taxable net income to you."

In his answer the respondent, though denying any error in his determination, admitted the above allegation of fact; and upon the basis of these pleadings the case came on for hearing. In its brief the petitioner entirely ignores the question of whether the amount credited on its books to the Bremen firm in 1923 and subsequently paid as commissions constitutes a proper deduction from the gross income of that year, and, contending that the respondent is bound by the explanation of his determination in the deficiency notice and that he must win or lose accordingly as the Board finds that such explanation does or does not legally support his determination, it sets forth that the sole question for decision is whether the commissions received by the Bremen firm are properly chargeable to the petitioner as its income. Devoting its entire brief to an argument on the latter question, the petitioner asserts that the evidence conclusively proves that the Bremen firm and the petitioner are separate and distinct taxable entities; consequently, that the income of the Bremen firm can not be charged to this petitioner; and that the respondent's deficiency determination, so far as based on the addition of $286,071.30 to the reported net income, must fail. In other words, the petitioner argues that, since the respondent explained the addition of $286,071.30 to the reported net income as income of

its " Bremen agency " properly includable in its tax return, and since he did not specifically say that the addition was based upon the disallowance of a portion of the deduction which the petitioner claimed for commissions paid or credited to the Bremen firm, the Board must assume that the respondent's determination is that the petitioner is entitled to a deduction for the entire amount of such commissions and it must set aside so much of the deficiency as is based upon this item, if it finds that the petitioner is not properly chargeable with the income of the Bremen firm.

There are fundamental weaknesses in this line of argument that are not easily disposed of. In the first place, the pleadings contain allegations by the petitioner, readily admitted by the respondent, to the effect that the petitioner claimed " a deduction from gross income in the 1923 tax return " for the commissions paid to the Bremen firm, in the amount of $286,071.30, and that " the respondent has in its 60-day letter disallowed these commissions as a deduction from gross income," though the respondent admits further that the explanation of his action in the deficiency notice was entirely different. Further, as was stated by the Board in *Edgar M. Carnrick*, 21 B. T. A. 12:

The phrasing of the notice of deficiency relating to the item in controversy, even if clear, is not the cause of action and does not frame the issues. The petitioner may not, without an expressly pleaded admission or a stipulation, treat the notice as an official acquiescence by the Commissioner in all petitioner's propositions as to this item except those expressly determined adversely to him. If the Commissioner finds one fact or reason which he believes supports his adverse determination, he is not required to express his views on any or all other matters relating to the item, and his failure to deal with them carries no implication as to their treatment. It is not the Commissioner's method of determination or computation which is the substance of the proceeding, for the deficiency may be correct despite a weakness in arriving at it or explaining it. *Woodside Cotton Mills Co.*, 13 B. T. A. 266; *Jacob F. Brown et al.*, 18 B. T. A. 859. " It is immaterial whether the Commissioner proceeded upon the wrong theory in determining the deficiencies. In any event the burden was on the petitioner to show that the assessment was wrong." *Altschul Tobacco Co. v. Commissioner*, 42 Fed. (2d) 609.

On the record before us, it is clear that the petitioner claimed a deduction, in computing taxable net income for 1923, of $336,554.48 for " commissions " paid or accrued in that year; and that the respondent allowed a deduction of only $50,483.13 and disallowed $286,071.30. The question, therefore, to be decided is whether the petitioner is entitled to the whole amount of the deduction claimed.

It is obvious that if this item is a proper deduction in computing net income, authority therefor must be found in section 214 (a) (1) of the Revenue Act of 1921, since no other section of the statute is broad enough to include an item of this character. That section

provides for the deduction of "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *."

It seems clear enough from the findings of fact that the new Bremen firm and the petitioner corporation are separate and distinct entities, though composed of the same persons, with like interests in both. These two entities were entirely free to deal with each other and fix their relations, by formal or informal agreements, as though they were composed of different persons, and business transactions between them are entitled to the same respect and consideration, in fixing their income-tax liabilities, as are accorded to dealings between less closely related business organizations, so long as their relations are not availed of as a mere vehicle for evasion of the tax. Cf. *Louis C. Rollo et al.*, 20 B. T. A. 799. If, therefore, the payments made by the petitioner to the new Bremen firm were ordinary and necessary in the conduct of its business and in the earning of its income, and were reasonable in amount, considering the services rendered, there is no bar to their deduction in the computation of net income. For what then were these payments, totaling $336,554.48, made by petitioner to the new Bremen firm?

It may be conceded, upon the evidence, that the old Bremen firm had enjoyed a very lucrative business in the cotton markets of Central Europe, and, at the outbreak of hostilities between the United States and the German Government, was possessed of an established good will of considerable value. With the outbreak of hostilities, however, it was forced to cease its business activities at Bremen, the seat of its operations, and apparently elected to remain inactive during that emergency. After the close of the war, it definitely abandoned the thought of resuming the business and reopened the Bremen office solely for the purpose of liquidation. In the interim, the petitioner had opened a branch office at Rotterdam and through that office had established connections with the former customers of the old Bremen firm and was carrying on business with those customers with apparently much success and not at all handicapped by reason of the former connections of those customers with the old Bremen firm. Such were the conditions existing at the time of the alleged demands of the members of the old Bremen firm for some sort of compensation, because the petitioner was capitalizing upon the business which they had built up, and when the petitioner was actually in possession of and enjoying the benefits of that business and its good will. What then was the necessity for the payment of these so-called "commissions" to the members of the old Bremen

firm? The only explanation therefor is to be found in the testimony of the petitioner's president, who was a member of the old and new Bremen firms and a stockholder in the petitioner, that it was very much to the petitioner's interest "to keep the former partners of the Bremen partnership in a friendly frame of mind." We are left to draw upon our own imagination as to the probable consequences of petitioner's failure to meet those alleged demands.

The record does not show that the new Bremen firm was directly responsible for a single dollar's worth of petitioner's sales in 1923, that is, that the members of the firm consummated a single dollar's worth of sales for the petitioner's benefit. If any portion of the petitioner's 1923 cotton sales in Central Europe can be attributed to the activities of any of the fourteen members of the firm, they may likewise be attributed to their activities as officers, directors and stockholders of the petitioner corporation. So far as we have been able to discover, the only services rendered by the new Bremen firm in 1923, for the petitioner's benefit, were represented by the activities of only three of its fourteen members, Walker, Lippitt and W. H. Sprunt. Walker was also manager of petitioner's branch office at Rotterdam, and Lippitt and Sprunt were executive officers of the petitioner, located at Wilmington, N. C. Walker divided his time about equally between Rotterdam and Bremen, at the latter place attending to the affairs of the old and new Bremen firms. Lippitt and Sprunt made several trips to Europe for the purposes of assisting in the liquidation of the affairs of the old Bremen firm and of further developing and retaining the business of that firm for the petitioner's benefit. It is wholly impossible from the evidence to draw any line of demarcation between their activities, as members of the Bremen firm, in the interests of the petitioner and their activities as officers, directors and stockholders of the petitioner. In any event the evidence does not justify the conclusion that they, as partners, rendered any services to the petitioner which would not ordinarily have been required or expected of them as officers of the petitioner. The fact that the payments made to the Bremen firm were not in excess of the commissions usually paid to selling agents does not of itself prove the reasonableness of these payments. The question is, was the total amount paid reasonable for the services rendered by the Bremen firm to the petitioner; and the answer must be in the negative, since the evidence is far from convincing that the firm rendered any services of substantial benefit to the petitioner. If the respondent had no more before him upon which to reach a determination in the matter than the evidence presented to us, we think he was more than reasonable in the allowance which he made.

We think the true character of these payments to the Bremen firm is best indicated by the fact of the admission to the partnership, apparently without any contribution of capital or services, of the seven individuals who were not members of the old Bremen firm but who, at the time of the organization of the new firm, were holders of common stock in the petitioner corporation, and the allotment to each of the fourteen members of the firm of an interest proportionate to his holdings of common stock in the petitioner. Asked if he could explain the admission to the firm of the seven new members under such circumstances, the petitioner's president testified that they were admitted " merely by agreement to satisfy their claim." What claim had these seven new members which could be satisfied only in this fashion? They had no interest in the old Bremen firm and no claim upon its business and good will. They contributed nothing in the way of capital or services to the new firm. All of the circumstances of which we have been apprised tend to indicate that their sole claim was the right to share with the majority of petitioner's common stock holders in any distribution of profits. We find no error in the respondent's determination in this matter.

2. The second issue raises the question as to whether the entire amount of commissions accrued on the petitioner's books, to the credit of the Societe Cotonniere Franco-Americaine, may be deducted in computing net income. The respondent contends that the French corporation is "merely an incorporated branch office of the petitioner," and that the accruals in its favor, on the petitioner's books, represent nothing more than distributions of profits. We think that the respondent's determination in this matter is erroneous. The evidence leaves no room to doubt the separateness of the two corporations, and there is no indication of fraud, attempt at tax evasion, or other circumstance which might justify or require a disregard of the separate corporate entities. The allowance of commissions to the French corporation could hardly be termed distributions of profits, since the corporation owned none of the petitioner's capital stock. The only question which might arise in connection with these commission allowances would be the matter of the bona fides of the allowances, and as to that, the evidence shows clearly that the allowances were made for services actually rendered in the consummation of sales for petitioner's benefit, and were computed at rates customarily allowed to petitioner's other selling agents. They represent a proper charge against the petitioner's gross sales as a part of their cost, and are a proper deduction in computing net income. The net income shown in the deficiency notice should be reduced by $33,736.28.

3. The third issue relates to respondent's action in adding to the reported net income an item of $601.05 on the ground that the net

income of the Houston branch office had been understated by that amount. The evidence shows that the respondent's determination in this matter is erroneous. The alleged understatement is due to the petitioner's payment of bonuses of $601.05 to employees of the Houston branch office. For reasons of its own, the petitioner made payments direct from its Wilmington office and without making any record thereof in the books of account of the branch office. In accounting for the profits of the branch office on the books of the home office, a charge was made against those profits for the amount of the bonus payments; consequently, the profits of the branch office as shown by the home office books were less, by the stated amount, than the profits shown by the branch office books. The net income shown by the deficiency notice should be reduced by $601.05.

4. In this issue the petitioner questions the propriety of the respondent's action in disallowing as deductions eight items, totaling $19,120.32, which the petitioner had claimed in its return as a part of its general expenses. The respondent, in his brief, confesses error as to the disallowance of two of these items, to wit: bonuses to employees, in the amount of $13,682.82, and cost of purchases of cotton samples, in the amount of $50; and the petitioner, in its brief, withdraws the assignment of error as it relates to three other items, to wit: payment to the New York Cotton Exchange in the amount of $20, a further payment to the New York Cotton Exchange in the amount of $20, and Wilmington Light Infantry dues in the amount of $100. There are left for our consideration three items, to wit: a contribution of $5,000 to a fund to be used in eradicating the boll weevil; a payment of $25 to the Order of Railway Yardmen for advertising inserted in a magazine published by that order; and payments amounting to $262.50 for advertising inserted in magazines published by the American Legion and various labor and trade organizations.

The respondent contends that the contribution of $5,000 to the fund raised by various cotton exchanges, to be used in the eradication of the boll weevil, should not be allowed, for the reason that the petitioner has failed to show definitely that it was in any way benefited by this contribution. We are of a different opinion. The petitioner was engaged in the business of exporting raw cotton and of operating a warehouse for the storage of the same commodity. Its business was dependent upon a normal production and a crop of good quality, both of which were, in turn, dependent upon the successful control of the boll weevil. We may take judicial notice of a situation generally known to exist, the prevalence of the boll weevil and its destructive effects upon the cotton crops of our southern States, to remedy which much is being done by the States and

national and private enterprise. In making the contribution there was no thought of charity or philanthropy; the motives of the petitioner were purely mercenary, its expectation being that its business would be benefited proportionately to the degree of success attendant upon the campaign of eradication or control of the pest. It is entirely unreasonable to ask the petitioner to measure the benefits of this contribution in terms of dollars and cents. The question always is whether balancing the outlay against the benefits *to be reasonably expected*, the business interests of the taxpayer will be advanced. *American Rolling Mills Co.* v. *Commissioner*, 41 Fed. (2d) 314. All circumstances considered, we think the benefits " to be reasonably expected " to flow from this contribution were, at least, fairly proportionate to the expenditure.

As to the amounts expended for advertising inserted in magazines published by the Order of Railway Yardmen, American Legion and various trade and labor organizations, totaling $287.50, the respondent contends that the names of the magazines in which the advertisements were inserted indicates that the expenditures were merely " good will donations." While such an inference might be drawn, it does not necessarily follow and it is negatived by the evidence.

Accordingly, the net income shown in the deficiency notice should be reduced by $13,682.82 for bonuses to employees; by $50 for cost of purchases of cotton samples; by $5,000 for contribution to the fund for eradication of the boll weevil; and by $287.50 for advertising in various magazines, a total of $19,020.32.

5. For some reason not disclosed by the deficiency notice, any admitted pleadings, or evidence, the respondent increased the 1923 inventory of petitioner's Charlotte branch office by $11,185.96. The petitioner asks us to set aside the respondent's determination in this matter, on two grounds: (1) Because his action, in holding that adjustments with sellers of en route cotton should be treated as additional cost of that cotton and reflected in its inventory value and not accounted for as an expense of the later year in which such adjustments are made, is contrary to the petitioner's consistent accounting practice and the best accounting practice in the industry; and (2) because the respondent failed to make a similar revision of the 1922 inventory, which is the opening inventory for 1923, in respect of the 96 bales of en route cotton included in that inventory, thus placing the opening and closing inventories for 1923 on different bases, with a resulting distortion in net income.

Both reasons are premised on the assumed fact that the increase made by the respondent in the Charlotte inventory reflects the adjustments made in 1924 with the sellers of the 1,396 bales of en route

cotton included in the 1923 inventory of the Charlotte branch. But we do not know whether the assumption is correct or not. Certainly, nowhere in the record is there an admission of the fact by the respondent—his brief is entirely silent on this issue; and there is no proof of a single fact which would indicate that the respondent's inventory adjustment is related to the 1,396 bales of en route cotton included in that inventory. For all we know, the respondent may have determined, in respect of the Charlotte inventory, that there was an erroneous count in the number of bales of cotton, or that inventory weights were incorrect, or any other of a number of possible errors which might be suggested. In short, we do not know why the respondent increased the Charlotte inventory by $11,185.96; consequently, the decision on this issue can not be limited to the consideration of any one particular element of the inventory valuation, but must embrace the whole matter of that valuation. Since the petitioner has failed to show that the Charlotte inventory was of a value less than that determined by the respondent, we are not in any position to disturb the respondent's determination. Furthermore, even if we could assume that the premise of petitioner's contentions is correct, there is no evidence that there were adjustments with sellers in 1923 in respect of the 96 bales of en route cotton included in the 1922 inventory; consequently, the petitioner has failed to prove that the respondent has been inconsistent in his treatment of adjustments with sellers in respect of the en route cotton in the opening and closing inventories for 1923 and thereby has placed the two inventories on different bases.

6. The record does not show whether the sum of $7,500 paid to Goldman and Unger in 1923, for services in connection with legal proceedings to recover war risk insurance premiums, was in payment of services rendered entirely to the petitioner or in payment of services rendered partly to the predecessor partnership and partly to the petitioner. If any part thereof was in payment for services rendered to the partnership, the payment was in satisfaction of a liability of the partnership which the petitioner assumed in part payment for the partnership's assets, and that part of the whole amount paid would represent a capital expenditure—additional cost to the petitioner of the partnership's assets, which would not be a proper deduction in computing net income.

Even if we assume that the payment was for services rendered entirely to the petitioner, the whole amount thereof still would not be deductible, because a portion thereof was expended in establishing petitioner's right, as assignee of the partnership by purchase, to recover amounts paid out by the partnership for war risk insurance premiums; and that portion of the payment represents an additional

cost to the petitioner of the partnership assets, a capital expenditure which may not be deducted in computing net income.

The evidence does not contain any facts upon which we could base a reasonable apportionment of the payment to the claims of the two entities, and we are unable, therefore, to determine what portion of the whole payment is a proper deduction in computing net income. Under the circumstances, the respondent's determination in the matter must stand.

7. This issue raises the question of the propriety of respondent's action in holding that certain expenditures made in 1923, and claimed as deductions by the petitioner in computing net income, were made for additions and betterments which materially prolonged the lives of the buildings, and, therefore, were of a capital nature and may not be deducted in computing net income.

As to the payment of $4,200 for the construction of a concrete wall around the petitioner's warehouse at Charlotte, the findings of fact clearly show the nature of this expenditure. Unquestionably, the concrete wall which replaced a wooden one no longer useful for the purposes for which constructed was a substantial and permanent betterment and rendered the building better suited to the purposes for which it was used. The expenditure for the construction of the concrete wall is of a capital nature and, therefore, is not a proper deduction in computing net income. Cf. *Georgia Car & Locomotive Co.*, 2 B. T. A. 986; *Black Hardware Co.*, 16 B. T. A. 551; affd., 39 Fed. (2d) 460; certiorari denied, 282 U. S. 841.

It is also clear that much that was done in renovating Building A at Wilmington, for the purpose of renting the building, was in the nature of permanent betterments. The entire plumbing system was overhauled, the building was rewired for electricity, new window sashes were installed, and window screens and screen doors replaced. While these betterments may not have materially prolonged the life of the building, they unquestionably rendered it better suited to the petitioner's purposes. Some part of the work done might well be considered as ordinary repairs which may be deducted in computing net income; however, the record affords no basis for a segregation of these items from those of a capital nature and, consequently, we can not determine what part of the entire cost of renovating the building is a proper deduction. *I. M. Cowell*, 18 B. T. A. 997. However, the respondent restored to income the sum of $3,050.07, which was the superintendent's estimate of the cost of renovating the building, whereas the actual cost was only $1,630.44, and only the latter amount was deducted by the petitioner in computing net income.

Our conclusions on this issue require a reduction in the net income as shown by the deficiency notice, in the amount of $1,319.63.

8. The petitioner contends that the inventory of the Wilmington branch, as of December 31, 1923, was overstated by $33,412.60, due to using incorrect and excessive weights in valuing the cotton of six grades, resulting in a like overstatement of net income. In the deficiency notice, the respondent reduced the net income reported in the return by $3,403.29; but the petitioner contends that there should be a further reduction of $30,009.31.

The petitioner placed in evidence the original inventory sheet showing the grades of cotton on hand, number of bales of cotton in each grade, weight of cotton in each grade, and value of the cotton in each grade. This sheet showed a total value for the inventory, of $4,122,-404.33. It also put in evidence a revised inventory sheet showing corrected weights for six grades of cotton; and the total value of the inventory, as shown by this revised sheet, is $4,088,991.73, which is $33,412.60 less than the value shown by the original inventory sheet. Not all of the difference of $33,412.60 is due to a correction in weights. An examination of the revised inventory sheet shows that of the total difference, $2,526.73 is due to a change in the unit price per pound of cotton en route to destination—the original inventory showing a unit price of $0.345 per pound, while the revised inventory shows a unit price of $0.3325 per pound. No evidence was presented by the petitioner to support this change in price; hence, the change may not be allowed.

While we have found that incorrect weights were used as to six grades of cotton in valuing the inventory, there is not sufficient proof to show error in the respondent's determination as to the value of the inventory. After investigating the inventory, the respondent determined, as indicated by the deficiency notice, that the inventory reported in the return had been overstated by $3,403.29. The deficiency notice, pleadings and evidence do not show the basis of that determination. The fact that the respondent did not make as great a reduction in the inventory as might be required by a revision of weights in six grades of cotton indicates that in all probability he found offsetting errors elsewhere in the makeup of the inventory. He was under no obligation to set forth fully in the deficiency notice the basis of his determination. The obligation rested on the petitioner, therefore, to prove the value of the inventory and the inventory value used by the respondent in his deficiency determination. The first required proof of quantities, according to grades, basis used in valuing the inventory, whether cost or cost or market, whichever is lower, and the unit price of each grade, cost or market, according to the basis of valuation, but the petitioner failed to prove either the basis or the unit prices used. As to the inventory value used by the respondent in the deficiency determination, we can only assume that it was the value shown

by the original inventory sheet reduced by $3,403.29; the deficiency notice indicates only that the respondent reduced the inventory value reported in the return by $3,403.29, but the value reported in the return may have been entirely different from the value shown by the original inventory sheet. The evidence is insufficient to show error in the respondent's determination as to the value of the inventory of the Wilmington branch.

9. The petitioner increased the book value of its compress equipment in 1923 by $15,622.53, and credited profit and loss account with a like amount. The amount so credited to profit and loss was included in gross income in the return, but $4,173.16 was eliminated from income by the respondent in the deficiency notice. The revaluation of the compress equipment and the arbitrary write-up on the books of the value of that equipment on the books did not give rise to any taxable income, and the whole amount of the write-up should have been excluded by the respondent from income. The net income shown in the deficiency notice should be reduced by $11,449.37.

10. The expense of removing a cotton compress from Wilmington to Houston, was an ordinary and necessary expense of carrying on the petitioner's business, *MacAdam & Foster, Inc.*, 8 B. T. A. 967; *Eastern Shoe Manufacturing Co.*, 8 B. T. A. 1169; and since the cost thereof has not been allowed as a deduction by the respondent, the net income shown by the deficiency notice should be reduced by $8,355.19.

11. The petitioner complains of respondent's failure, in computing net income for 1923, to allow as a deduction the sum of $350,000 representing alleged interest paid to the holders of petitioner's certificates of paid-in surplus in that year.

In *James Sprunt Benevolent Trust et al.*, 20 B. T. A. 19, it was held that the payments received from this petitioner on the certificates of paid-in surplus under consideration in this case were interest income and not dividend income to the trust, and were subject to both the normal and surtaxes. In the instant case, however, the evidence as to the nature of these payments is much more full and complete than that presented to the Board in the cited case, and clearly reveals the true nature of these payments to be dividends and not interest. Clearly the holders of these certificates of paid-in surplus are shareholders in the petitioner and not creditors. The resolution adopted at the stockholders' meeting of June 9, 1919, and the instrument itself disclose that the funds represented by these certificates have been invested in the business without any guarantee of return and subject to all the risks and hazards of the business. The semiannual payments to the certificate holders of 7 per cent upon the face value of the outstanding certificates are denominated " dividends " in the

certificate, and are required to be paid, by the provisions of the certificate, out of earned surplus or net profits of the corporation. The rights of the certificate holders to repayment of the principal sums or face values of their certificates and the accrued dividends thereon are subordinate to those of the general creditors of the business. They have only preferred rights over the holders of common stock. In the last analysis, these certificates are nothing more nor less than certificates of preferred stock, and the amounts paid to the holders thereof in 1923, in accordance with the provisions as to dividends, are dividends and not interest payments. The decision in *James Sprunt Benevolent Trust et al.*, *supra*, is not controlling here. There is no error in respondent's determination by reason of his failure to allow as deductions, in computing net income, the amounts so paid to holders of certificates of paid-in surplus.

12. We have already held in our decision of the first issue that the Bremen firm and the petitioner are separate and distinct taxable entities; and there is no provision of law under which the net loss of the Bremen firm for 1923 may be allowed as a deduction in computing the petitioner's net income for that year.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*