GLOBE CONSTRUCTION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 43438, 51694, 53310. Promulgated January 12, 1932.

*Thomas A. Williams, C. P. A.,* for the petitioner.
*James L. Backstrom, Esq.,* for the respondent.

OPINION.

MURDOCK: The petitioner claims that its interest in the Casey-Kelly contract cost it $50,000 and, therefore, it is entitled to deduct one-seventeenth of this amount in each year under that provision of the revenue acts which permits the deduction of " a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." This allowance for the years in controversy must be based upon either the cost of the property to Kelly, or the cost of the property to the petitioner. The respondent contends that the property was acquired after December 31, 1920, by the corporation by the issuance of its stock or securities in connection with a transaction described in paragraph 4 of subdivision (b) of section 203 of the Revenue Act of 1926, and therefore the basis for depletion or depreciation would be the cost to the transferor, Kelly, which cost was nothing. Section 204 (a) (8) and section 204 (c). Section 203 (b) (4) provides for a situation where property is transferred to a corporation by one or more persons solely in exchange for stock of the corporation, and immediately after the exchange such person or persons are in control of the corporation. Control means the ownership of at least 80 per centum of the stock. We think that the provisions of the sections

above mentioned apply to the facts in this case, and the basis to the petitioner for depletion or depreciation is nothing.

The petitioner's original allegations in these proceedings were that 5,000 shares of its capital stock, which had a par value and an actual value of $50,000, were issued to Kelly in consideration for his rights under the contract with Casey. Kelly swore to these allegations. According to the corporate minutes of the petitioner, stock of the par value of $50,000 was issued to Kelly in consideration for his interest in his contract with Casey. At the hearing, after it was called to the attention of the petitioner's counsel that his allegations did not set forth a cause of action on this point, he amended his pleadings to allege that Kelly received only 3,140 shares for himself for his interest in the contract, and the other shares issued were to go as prearranged to other individuals in consideration of certain services which these individuals had performed for the corporation. There is no suggestion in the corporate minutes that these shares were to go to these individuals under the circumstances mentioned in the amended petition. On December 19, 1921, Kelly assigned his interest in the contract to the corporation and received 5,000 shares of stock. None of these shares were distributed to any others until March 31, 1922. We are now asked to find that during this time Kelly did not own the stock, since he had previously entered into oral agreements requiring him to transfer to various individuals certain of the 5,000 shares which he received. Ansley had done a little legal work. But the proof offered to show what the other individuals had done for the corporation is not convincing. Most of them had done nothing, so far as we can see, which would be consideration for Kelly's promise or justify the issuance to them of any valuable stock. The mere promise to make a gift transfers no title in property. So far as we can see, Kelly was the owner of the shares until he actually gave them away on March 31, 1922. The petitioner would be no better off, however, if these individuals acquired an interest in the contract prior to the time that Kelly turned it in to the corporation, for in that case section 203 (b) (4) would still apply, since there was an exchange by two or more persons each of whom received stock substantially in proportion to his interest in the property prior to the exchange.

If our reasoning above is wrong and these sections do not apply, then the amount of the deduction to which the petitioner is entitled depends upon the fair market value of the property acquired. This is so because when the petitioner acquired the property in question it had no other property, so far as we know, and the fair market value of the stock which it paid for this property was no greater than the value of the property. Thus, it was incumbent upon the peti-

tioner to prove the value of the property which it acquired from Kelly on December 19, 1921. Cf. *Hershey Manufacturing Co.*, 14 B. T. A. 867; affd., 43 Fed. (2d) 298. The petitioner realized this and offered a great deal of evidence which was intended to support the alleged value of $50,000. Opinions were given by a number of witnesses. But no qualified witness gave an estimate which appears to be reliable or justified by the facts. Each failed to consider one or more of the essential facts or uncertainties which a prospective purchaser would undoubtedly have taken into consideration. They disregarded the fact that Casey was to be paid a royalty of 15 cents. None made any allowance for the fact that there was on December 19, 1921, only an application for a patent. The value of the contract to the owner on that date depended a great deal upon the prospects and probabilities of the ultimate issuance of letters patent. No witness was shown to be qualified to estimate these probabilities and to gauge their effect upon value. Casey and Kelly were witnesses for the petitioner on the question of the value of Kelly's rights. Kelly acquired these rights from Casey on December 1, 1921, at no cost. Yet both say that they were worth over $50,000 eighteen days later. Shortly thereafter Kelly gave away over 37 per cent of the stock which he acquired in exchange for these rights. There is no reason to believe that the rights fluctuated in value during this period.

The petitioner intended to operate only in New Orleans. The council of that city had adopted specifications for the construction of its streets which did not permit the use of " Cascemco." The petitioner experienced great difficulty in having " Cascemco " included in the specifications. Not until February 29, 1924, did the council finally permit the paving of one street with this material. It appears from the evidence that any reasonable person would have anticipated some such difficulties as the petitioner later actually experienced.

The sales of stock do not show that the assets had any value on December 19, 1921, when we consider the time of the sales and the circumstances under which they were made. Cf. *Fruen Investment Co.*, 2 B. T. A. 542; *Stollwerck Chocolate Co.*, 4 B. T. A. 467. Frequent contradictions weaken the effect of the petitioner's evidence. The future for " Cascemco " was extremely doubtful on December 19, 1921, and the evidence does not indicate that the rights acquired by the petitioner had any fair market value on that date. Thus, whether the basis for the deduction is cost to Kelly or cost to the petitioner, the result is the same. The Commissioner must be sustained on this point.

The petitioner contends that it expended $26,431.25 in a successful campaign to have " Cascemco " included in the paving specifications

of the city of New Orleans, and, therefore, it should be permitted to deduct a portion of this amount in each of the years before us. The petitioner conducted the campaign and no doubt expended some money in that connection, but the first question is, How much did it expend which should be capitalized? The respondent made no objection to the offer in evidence of a very badly kept book of accounts. It was admitted with the understanding that any material entries would be called to our attention and properly explained. The petitioner failed to do as directed and we might well disregard the evidence contained in this book. But, since the respondent seems to be satisfied with what the book shows, we have found from it that the petitioner expended $3,197.20 in promoting " Cascemco." A portion of this amount may be deducted in each year as contended by the petitioner. In its brief the petitioner contends that Kelly's salary, as president and general manager, amounting to $19,300, other salaries, and organization expenses should be capitalized and exhausted over the life of the patent. The petitioner did some business during the years 1922 or 1923. How much we do not know. The corporate minutes refer to Kelly's salary, but we do not know of any other salaries or organization expenses. The record does not justify capitalizing all or any particular part of Kelly's salary during these years.

The remaining issue relates to the right of the petitioner to deduct $8,850 in each of the years 1925 and 1926. The petitioner has failed to tell us under what section of the revenue act it claims this right. Each amount is supposed to represent one-half of the cost of financing certain construction work performed in those years. In 1924, 1,570 shares of the petitioner's stock were issued to Dalgarn in consideration of the latter's promise to finance the corporation in such contracts as it might secure. This contract was not offered in evidence but, according to Dalgarn and the corporate minutes, it covered an indefinite period, the probable extent of which we are totally unable to estimate. The benefits were not restricted to the two years. The payment was not made in these years. It was never made as cost of any contract. The method of bookkeeping and income reporting has not been shown. Under such circumstances the petitioner is not entitled to the deductions claimed.

*Judgment will be entered under rule 50.*