## AMERICAN CHEMICAL PAINT COMPANY, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 43124. Promulgated April 21, 1932

*Percy W. Phillips*, *Esq.*, and *D. V. Johnston*, *C. P. A.*, for the petitioner.

*Arthur Carnduff*, *Esq.*, for the respondent.

### OPINION.

MURDOCK: The Commissioner determined a deficiency of $3,449.94 in the petitioner's tax liability for the year 1927. His only adjustment was to disallow depreciation on patents in the amount of $25,555.12 because the patents on which depreciation was claimed were paid for in stock, and the value of the stock was not shown. The only error assigned is the action of the Commissioner in disallowing depreciation on patents.

The petitioner was incorporated under the laws of Delaware, on February 21, 1914. Its principal place of business is at Ambler, Pennsylvania, and it filed its income-tax return for 1927 with the collector of internal revenue at Philadelphia, Pennsylvania. It was incorporated for the purpose of exploiting an invention of a method of preparing steel automobile bodies and other metal surfaces for painting by first treating the metal with a certain solution. The inventor was George D. Feidt. The organizer, and later the president of the petitioner, was J. H. Gravell. In 1913 Gravell was assistant to the superintendent of painting in the paint shop of a

firm located near Philadelphia which was engaged at that time in the manufacture of steel bodies for the Hupp Motor Company. Steel bodies for motor cars came into use in about the year 1912. The manufacturers of these bodies encountered serious difficulties in preparing the metal for painting. Various methods of cleaning and preparing the metal surface were tried, but despite all that was done the paint very soon came loose in places, due to the fact that the metal rusted under the paint. In 1912 and 1913 many steel bodies were returned to the manufacturer on account of this defect.

Feidt was a wholesale druggist in Philadelphia. He had furnished some material to the firm by which Gravell was employed. As a result of this connection he learned of the difficulty which his customer was having. In the fall of 1913 he invented the method of preparing steel for painting on which letters patent were subsequently issued. On February 4, 1914, he filed in the United States Patent Office application for letters patent on his method. This application was given Serial No. 816,537. On February 6, 1914, he assigned his whole right, title and interest in and to his application for patent No. 816,537 and to any patent that might issue thereon, to Percy C. Feger of Philadelphia. The assignment recited a consideration of $1 and other good and valuable considerations. On March 18, 1914, Feger made a similar assignment of the application to the petitioner. The stated consideration for this assignment was 9,000 shares of the common stock and 150 shares of the preferred stock of the petitioner, and other good and valuable considerations. On September 8, 1914, Patent No. 1,109,670 was granted as a result of this application.

On September 14, 1914, six days after the issuance of the above mentioned patent, Feidt filed an application for a patent on a cleaning compound for metals. It was assigned Serial No. 861,550. On September 17, 1914, Feidt assigned his whole right, title and interest in this application, and any patent that might issue thereon, to the petitioner for a recited consideration of $1 and other good and valuable considerations. On December 1, 1914, Patent No. 1,119,781 was issued as a result of this application. The patented compound for cleaning metals, Patent No. 1,119,781, was somewhat similar to the solution described in the patented method of preparing steel for painting, Patent No. 1,109,670.

The authorized capitalization of the petitioner was $500,000, consisting of 9,000 shares of common stock of the par value of $50 a share, and 1,000 shares of preferred stock of the same par value; $42,500 par value of preferred stock was retained in the treasury; $2,500 par value of preferred stock was sold for cash; and all of the rest of the stock, consisting of $5,000 par value of the preferred

stock and all of the common stock in the amount of $450,000 par value, was issued at or shortly after the time of the incorporation of the petitioner for an invention covered by an application for patent.

The parties agree that since the property thus acquired was the only asset of the corporation, the value of the stock issued for it representing the cost of the property to the corporation is measured by the fair market value of the property on or about February 25, 1914. Cf. *Hershey Manufacturing Co.*, 14 B. T. A. 867; affd., 43 Fed. (2d) 298. The petitioner therefore attempted to prove this value by calling one witness, Feger, and having him state that in his opinion the property was then worth at least $450,000. The petitioner relied upon certain decisions of the Court of Appeals of the Third Circuit in which the Board was reversed for failing to follow the opinions of witnesses where the record contained no contrary opinions, e. g., *Boggs & Buhl, Inc.*, v. *Commissioner*, 34 Fed. (2d) 859. This case may go on appeal to that court. The decision of the case rests entirely upon whether or not we are absolutely bound by the opinion of this one witness. The petitioner concedes this and makes no contention that there is any other method of valuation upon which it relies. This corporation of course had no past history which would indicate a value based on earnings. We have not been told when the $2,500 par value of preferred stock was sold nor how much was received for it. But even if we knew these facts we could not determine from them the value of the common stock which the petitioner claims formed the larger part of the consideration. We know that the stock was to be issued to Feger or his nominees, but we do not know who received it, except that Feger, at the time of the hearing, held only three shares of common and none of the preferred. It might be very helpful to know who received the stock and the circumstances under which it was received. We do not know that Feidt ever became a stockholder. A statement of profit and loss introduced by the petitioner shows royalties. These were not explained. Perhaps Feidt disposed of his rights on a royalty basis. It might be helpful to know about that.

The witness, Percy C. Feger, had been engaged in the general practice of law in Philadelphia since 1905. He first learned of the invention from Gravell, who consulted him as to how to market it and for whom he made an investigation of the matter. He had had little previous experience with inventions. His investigation included an afternoon visit to the shop where Gravell was employed. There he saw some steel automobile bodies being treated by the method invented by Feidt, and tried his hand at swabbing and drying some of the bodies. He also experimented with some small sheets of steel at his home. He had some correspondence with manufacturers of automobiles and obtained some information on the num-

ber of steel bodies manufactured up to February, 1914. He knew that at least several hundred of these bodies had been treated by the petitioner's process with satisfactory results. If he knew any other fact of importance at that time, we have not heard of it. He organized the petitioner for his client and has ever since been associated with it as director, secretary-treasurer, and general counsel. We do not know who the other original directors were. A large part of his time has been devoted to the affairs of the corporation. He has handled most of its business dealings with customers. He anticipated in February, 1914, that the corporation would have some hard years at the beginning and would have trouble from infringements, due to the simplicity of its process and the difficulty of detecting infringements in paint shops all over the country. The company found many cases of infringement and its total profits for the first eight years of its existence, without deduction for exhaustion of patents, amounted to less than $150,000. If deductions had been taken at the rate now contended for, the corporation would have suffered a loss of over $50,000 for this period. The profits have been very substantial since 1922, but prior to that time the corporation had acquired other value patents and new markets not anticipated in 1914. The original process, which was a very simple and inexpensive one to use, was still in use in the taxable year 1927, at which time practically every automobile manufactured in the United States was being subjected to this process.

Feger's opinion was not predicated upon any sale or offer to sell, and he was so inadequately examined as to the facts upon which he relied and the reasoning which he employed in arriving at his conclusion as to value that we are unable to see exactly what his method was. His only explanation was as follows:

Well, I considered the number of steel bodies that were manufactured from the beginning in 1912 and the enormous increase of the number of those bodies over the years. I did not foresee the enormous increase in automotive transportation that we have witnessed. I took the profit that we could make at $2.50 a gallon, a net profit of 20 cents a body, and I figured that we would do at least 300,000 bodies a year, because that was the production of steel bodies in 1912, and it increased 100,000 in 1913, and I thought there would be, certainly, that normal rate of increase, of say one-third, or if not one-third at least 100,000. On the basis of that, that gave me $60,000 a year; and in seventeen years, a man would certainly contemplate, in buying the patent, he was going to make a profit, and he would take in over a million dollars. So I think I was very conservative when I put in a value which, since that time, we have earned in one year.

He assumed that the corporation would make a profit of 60 cents on each gallon of material and that only three automobile bodies would be processed from each gallon. Yet he testified that a gallon

of material would always be sufficient to process three bodies and, depending upon the degree of care used, might be sufficient to process any number up to six. There is no testimony to indicate that in February, 1914, anyone could reasonably have anticipated that the material would be sold for $2.50 a gallon or that the corporation would derive therefrom a profit of 60 cents a gallon. The witness further assumed, without stating any particular reason, that 300,000 bodies would be processed each year with the new material. Our own experience and general knowledge of the subject tells us that a prospective purchaser would not have made many of the assumptions which the witness makes. We do not believe, for example, that he would have invested any substantial amount in the application for a patent without first assuring himself that the alleged invention was patentable, did not interfere with any previous patent, and that a patent would probably issue. See Robbs Patent Essentials, 1922, p. 258. There is no testimony to show what he could have learned in this connection in February, 1914. The witness was not shown to be qualified to judge the probabilities of patentability. Cf. *Globe Construction Co.*, 25 B. T. A. 146; *Joseph H. Adams*, 23 B. T. A. 71; *Hershey Manufacturing Co.*, *supra*. He assumed that a buyer or seller would have known in February, 1914, that a patent would certainly be granted because up to that time no interferences had been cited. He seemed to think that the application had been on file since the previous fall, but as a matter of fact it had been on file not more than three weeks when the application was turned in for stock. It was not until more than six months later that the first patent was issued. The witness, in some unexplained way, arrived at a present value for the application for patents in February, 1914, from aggregate profits of $1,020,000 ($60,000 x 17) which he estimated would be earned in the seventeen years. We have general knowledge that at least a portion of profits is frequently attributable to good management and that ordinarily a part of profits must be considered as a normal return on the capital and other assets used in a business before arriving at a value for patents. We do not know what allowance, if any, the witness made on account of these things or on account of the various uncertainties of the future, such as changes or improvements of one kind and another which any reasonable person would consider before investing in an application for a patent such as this one. Cf. *National Water Main Cleaning Co.*, 16 B. T. A. 223, 238.

Some value was inherent in this invention, but certain serious difficulties which would have to be surmounted by anyone who might attempt to exploit it were also inherent in the invention and apparent from the very beginning. Feger and his associates, whoever they were, were perhaps justified in their hope that Feidt's invention would

ultimately prove successful and result in large earnings, that it had a potential value; but we are concerned only with market value in February, 1914. We may not be unduly influenced by the subsequent grant of the patent or by the success which the company ultimately achieved. Cf. *Commissioner* v. *Stephens-Adamson Manufacturing Co.*, 51 Fed. (2d) 681. We have no special knowledge of this patent application in 1914 aside from what we have learned from the record, nor private knowledge of any particular facts material to the decision of the case. If we had, we would have to put that special knowledge aside in the decision of this case, for we are governed by the evidence adduced. Obviously the well recognized presumption in favor of the correctness of the determination of the Commissioner is vain and futile if it may be overcome by the unsupported opinion of a single witness as the petitioner contends. If we are to act intelligently, we must judge of the weight and of the force of the opinion by our own general experience and general knowledge of the subject of inquiry. *Head* v. *Hargrave*, 105 U. S. 45; *The Conqueror*, 166 U. S. 110; *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893; *Bogle & Co.* v. *Commissioner*, 26 Fed. (2d) 771; *Balaban & Katz Corporation* v. *Commissioner*, 30 Fed. (2d) 807; *Am-Plus Storage Battery Co.* v. *Commissioner*, 35 Fed. (2d) 167; *Anchor Co.* v. *Commissioner*, 42 Fed. (2d) 99; *Patterson* v. *Commissioner*, 42 Fed. (2d) 148; *Tracy* v. *Commissioner*, 53 Fed. (2d) 575. We are not obliged to accept the opinion of this witness as absolute, yet we do not disregard his testimony, nor do we refuse to follow his opinion for no reason at all. Our reason is that in the light of the facts proven and of our own experience and general knowledge of the subject of inquiry, his opinion does not appear to be even reasonably reliable. We must assume that the petitioner produced all of the evidence which was available or at least all that it cared to present. Since the evidence produced is not reasonably convincing of the value contended for, the loss must fall upon the petitioner. Cf. *Burnet* v. *Houston*, 283 U. S. 223; *Jankowsky* v. *Commissioner*, 56 Fed. (2d) 1006.

*Judgment will be entered for the respondent.*