SECURITY FIRST NATIONAL BANK OF LOS ANGELES AND CAROLINE
H. HOLLADAY, EXECUTOR AND EXECUTRIX OF THE LAST WILL AND
TESTAMENT OF HENRY E. HUNTINGTON, DECEASED, PETITIONERS,
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 45429.   Promulgated June 6, 1933.

*Thomas G. Haight, Esq., Roswell Magill, Esq., James O. Wynn, Esq., J. Marvin Haynes, Esq., Robert H. Montgomery, Esq.,* and *E. H. Conley, Esq.,* for the petitioners.

*M. B. Leming, Esq.,* and *J. R. Gaskin, Esq.,* for the respondent.

302

OPINION.

## I.

Murdock: The Commissioner has included in the decedent's income for each period the income for the corresponding period of the trust, known as the Henry E. Huntington Library and Art Gallery. The explanation given in the notice of deficiency and the arguments now advanced by the respondent indicate that he relies

upon the following provisions of subsections (g) and (h) of section 219 of the Revenue Act of 1926:

(g) Where the grantor of a trust has, at any time during the taxable year, * * * the power to revest in himself title to any part of the corpus of the trust, then the income of such part of the trust for such taxable year shall be included in computing the net income of the grantor.

(h) Where any part of the income of a trust may, in the discretion of the grantor of the trust * * * be distributed to the grantor or be held or accumulated for future distribution to him * * * such part of the income of the trust shall be included in computing the net income of the grantor.

The same provisions were in the Revenue Act of 1924. Congress intended by the enactment of these provisions to prevent a taxpayer from reducing, or altogether avoiding, his income tax liability by the creation of a trust to hold income-producing property and the retention of a power which would enable him at will to withdraw the property or to direct the payment of the income to himself. The words of Congress are clear enough for present purposes and the case may not turn upon any ambiguity in the language of the taxing statute. If the words of either of these provisions cover the case, the Commissioner must be sustained even though the decedent never exercised his power and even though to tax him may appear to be a great hardship. *Corliss* v. *Bowers*, 281 U.S. 376; *Clapp* v. *Heiner*, 51 Fed. (2d) 224; *Alfred F. Pillsbury*, 19 B.T.A. 1229, 1233. Conversely, if the letter of the act does not apply, then there should be no enlargement through interpretation. In short, we are to apply the act as we find it and not our own notions of equity. *Crooks* v. *Harrelson*, 282 U.S. 55.

Both parties agree that the original trust deed must receive primary consideration since the others refer to and depend upon it. There are no provisions in that deed expressly authorizing or permitting distribution or accumulation of income to or for the grantor. But the respondent contends that the grantor retained to himself the power to revest in himself title to the trust property and also the power to distribute to himself the income of the trust. He points particularly to the provisions of Paragraph VII of the original trust instrument, wherein the grantor reserved to himself the right to absolute dominion over the personal property conveyed to the trust and the income therefrom, the right to absolute dominion over the income of the real property, and the right to improve, change, manage, and control the trust property as if the trust had not been made. The paragraph also provides that these rights shall be exercised without let or hindrance and free from all interference from any source whatever. Paragraph IX provides that the grantor reserves to himself the absolute dominion over any real or personal property thereafter given to the trustees. Furthermore, there was no

liability upon him to account to anyone for anything he did with the property. The rights thus reserved were never relinquished by the decedent as long as he lived.

"Absolute" means perfect, complete, unrestricted, freed or loose from any limitation or condition. "Dominion" means ownership or right to property, including the right to claim, use, enjoy, and dispose of to the exclusion of every other person. The phrase "absolute dominion" must ordinarily connote unrestricted, perfect, and complete ownership in a thing. Webster's New International Dictionary; Bouvier's Law Dictionary, Rowles 3d ed., *People* v. *Perry*, 84 Cal. 31; 24 Pac. 33; *Columbia Water Power Co.* v. *Columbia Electric Street Ry. Light & Power Co.*, 172 U.S. 475. Cf. *Anderson* v. *Wilson*, 289 U.S. 20. No California case in point has been called to our attention. In *People* v. *Cogswell*, 113 Cal. 129; 45 Pac. 270, there is no indication that the grantor reserved any right of absolute dominion. Yet the California statutes provide that there may be such a trust.[1] There is no showing that any of the income of the

---

[1] Chapter LVII of the Statutes of California, approved March 9, 1885, provides substantially as follows:

SECTION 1. The act shall be liberally construed to effect its objects and promote its purposes.

SECTION 2. Any person, desiring, in his lifetime, to promote the public welfare by founding, endowing, and having maintained, within the state, a university, college, school, seminary of learning, mechanical institute, museum, or gallery of art, or any or all thereof may convey to trustees any of his property within the state for this purpose.

SECTION 3. The grantor may designate:
1. The nature, object, and purpose of the institution,
2. Its name,
3. The powers and duties of the trustees, etc.,
4. The method of appointing successors,
5. Rules and regulations for management of the property,
6. The time and place for erecting buildings, and provide for all other necessary things to carry out the purpose of the grant, including what shall be taught and who shall use without charge.

SECTION 4. The trustees may sue and defend.

SECTION 5. The grantor, by a provision in the grant, may elect to perform all duties and exercise all powers of the trustees during his life.

SECTION 6. The grantor may "reserve the right to alter, amend, or modify the terms and conditions thereof, and the trusts therein created, in respect to any of the matters mentioned or referred to in subdivisions one to six, inclusive, of section two hereof; and may also therein reserve the right, during the life of such person or persons, of absolute dominion over the personal property conveyed, and also over the rents, issues, and profits of the real property conveyed, without liability to account therefor in any manner whatever, and without any liability over against the estate of such person; and if any such person be married, such person may, in said grant, further provide that if his wife survive him, then such wife, during her life, may have the same absolute dominion over such personal property, and such rents, issues, and profits, without liability to account therefor in any manner whatever, and without liability over against the estate of either of the spouses."

SECTION 7. The grantor may provide that the trustees may become custodian of the person of minors.

SECTION 8. The grant may be executed, acknowledged, and recorded like grants of real property.

SECTION 9. No action to set aside, annul or affect the conveyance or the title to the trust property can be commenced more than two years after the recording of the grant.

SECTION 10. The property conveyed shall not after a lapse of two years from the date of recording be subject to force sale under exemption, etc., against the grantor unless

trust was from real estate. If the decedent retained during his life perfect, complete and unrestricted ownership of a part or all of the corpus of the trust, and particularly of all of the income, obviously he could at any time revest legal title in himself and he could in his discretion distribute the income to himself. The Commissioner contends that he did retain these rights and therefore the income was properly included in his income.

The petitioners contend that the phrase " absolute dominion " as used in the statute and in the trust instrument means only a power to further the trust for eleemosynary purposes. They are drawn to this conclusion, not by one determinative word or provision, but by the application of several rules of interpretation. They point to a number of the provisions of the original trust instrument and the act which, they contend, can not be reconciled properly with the respondent's interpretation of the words " absolute dominion." In order to avoid incongruities, and in order to give meaning to each provision of the deed and of the act, they say that the words " absolute dominion " must mean something less than the power to revoke, deplete or destroy the trust. They also call attention to the California Act of March 21, 1872, California Civil Code, sec. 2280:

A trust cannot be revoked by the trustor after its acceptance, actual or presumed, by the trustee and beneficiaries, except by the consent of all the beneficiaries, unless the declaration of trust reserves a power of revocation to the trustor, and in that case the power must be strictly pursued.

Their argument is sufficiently specious to require careful consideration. This we have given it, but without being convinced that the plain words used by the decedent admit of any modification. Consequently, we may not go outside the deed and the act to raise a doubt as to the meaning of the words used or to find the intention of the grantor. Objections can be suggested to each view, but in our opinion the respondent's conclusion is the one most easily and naturally reached.

Huntington apparently desired absolute freedom, so long as he might live, in developing his ideas concerning the use of the trust property. Cf. *Fosdick Estate*, 139 Atl. 318. He reserved the power to deal with all contingencies which might arise. He alone was to

---

the action was commenced within two years of recording. Nor shall it be sold under execution, etc., if there be other property of the grantor available.

SECTION 11. The grantor may by will give all of the trust property to the state, to take effect only should the trust fail for any reason, as an assurance that his wishes will be carried out as nearly as may be.

The above act was amended in 1891 to include in the list of institutions botanical gardens and public parks.

An act, supplemental to the above act, was approved on March 13, 1903. It provides that the founders may surrender their reserved rights at any time and thereupon all rights, powers, privileges, trusts and duties shall vest in and devolve upon the trustees as they would otherwise have done upon the death of the grantors.

be the judge of the sufficiency of his reason for any of his acts. Yet he desired to have in existence a trust which would manage the trust property from the moment of his death. He further desired that this trust should not be untried but should be an organization which had developed with him and which had benefited through the experience of operating, at least formally, during his life. Thus, he made the trust something more than a potentiality during his life. He allowed it to operate in form at least. The trustees were permitted to gain experience in the conduct of its affairs during his life, and when he died and actual control passed into the hands of the trustees they were not untried. Viewed in this way all of the provisions of the deed have some reasonable purpose and there is no part of the deed which is inconsistent with any other. The statute of California permitted him to do what he did. He retained for himself broad powers and he also retained powers more restricted. The retention of one does not negative the retention of the other. He actually exercised the more restricted powers, but the occasion never arose for the exercise of the broadest powers he retained. One who can act as trustee without accounting to anyone, who has retained absolute dominion over the property and over all of the income, and who can control the trust property as if the trust had not been made, has very extensive powers. These, in our opinion, included the power to revest in himself legal title to the personal property at least, and perhaps to the realty, and the power and discretion to appropriate all of the income of the trust property for his own purposes apart from the purposes of the trust. Cf. *Porter* v. *Commissioner*, 288 U.S. 436. " He was free at any moment, with reason or without, to revest title in himself * * *." *Burnet* v. *Guggenheim*, 288 U.S. 280. The income was subject to his unfettered command. *Corliss* v. *Bowers, supra.* The Commissioner did not err in taxing the income of the trust to the grantor. Cf. *Grace Whitney Hoff*, 20 B.T.A. 86; *Joseph H. Bromley, Jr.*, 26 B.T.A. 878; *Reinecke* v. *Smith*, 289 U.S. 172; *Jackson* v. *Commissioner*, 64 Fed. (2d) 359; *O'Donnell* v. *Commissioner*, 64 Fed. (2d) 634; affirming 25 B.T.A. 956.

## II.

The next question would not arise had our decision on the first point been in favor of the petitioners. The Commissioner not only taxed the income of the trust to the petitioners for 1925 and 1926, but for those years he failed to allow, as an offset against that income, losses incurred in those years in the operation of a ranch. For each year the ranch had certain income and certain expenses.

The Commissioner does not question the amount of either. In each of the two years the expenses exceeded the income. The Commissioner has not included the ranch income in computing the deficiencies and he has not reduced trust income by the ranch expenses. He did not comment on the matter in his notice of deficiencies. In order to limit the evidence to matters as to which the parties were at odds, the Board Member asked counsel for the respondent to state the ground upon which the respondent relied to support his action. Counsel replied that the respondent's position was that the ranch was operated for Huntington's pleasure and the expenses were not incurred in a business carried on for profit. Thereupon the petitioners introduced evidence to refute this position. That evidence is not as complete and convincing as it might be. Nevertheless, it sufficiently negatives, for present purposes, the Commissioner's view that the ranch was conducted as a rich man's hobby. The ranch was operated for profit. Cf. *Edwin S. George*, 22 B.T.A. 189. Counsel for the respondent in his brief argues that the proof fails to show that the expenditures were ordinary and necessary. In view of his statement at the trial referred to above, proof of such facts was unnecessary.

## III.

The third issue is whether or not the Commissioner erred in holding that a transfer of land was equivalent to the receipt by the decedent of a dividend of $509,600. Originally the amount involved was $866,320, which the Commissioner had determined was the value of the land. The parties have stipulated that the value was $509,600. Consequently, the difference between the two figures should be excluded from income on the basis of the stipulation. The petitioners have raised this issue as an alternative to be considered only in the event the first issue is decided adversely to their contention. But the respondent argues that he has correctly included the value of the land in the decedent's income as a dividend, regardless of whether or not the income of the trust is taxable to the decedent.

The land belonged to the Huntington Land and Improvement Co. The decedent owned all of the stock of that corporation and exercised control over it. He wanted to purchase some objects of art for the Henry E. Huntington Library and Art Gallery from a certain art dealer. Therefore he suggested to the vice president of the corporation that the corporation transfer the land to the trust so that the trust, in turn, could transfer the land to the dealer in exchange for the art objects. This was known to be satisfactory to the dealer. The corporation made the transfer on January 25, 1927, pursuant to a resolution of the directors in which the transfer

was described as a gift. On the same day the trust made the exchange with the dealer. The Commissioner held that the transaction was equivalent to the distribution of a dividend to the decedent. This holding must be sustained. The corporation had ample earned surplus from which to distribute a dividend of $509,600. A dividend may be paid in kind. *Peabody* v. *Eisner*, 247 U.S. 347. It need not be called a dividend. *Phelps* v. *Commissioner*, 54 Fed. (2d) 289; affirming 20 B.T.A. 866; certiorari denied, 285 U.S. 558. Although the directors may have called it a gift and intended to make a gift, it may nevertheless be a dividend. *Lincoln National Bank, Executor*, 23 B.T.A. 1304; affd., 63 Fed. (2d) 131. Cf. *Alexander Sprunt & Sons* v. *Commissioner*, 64 Fed. (2d) 424, affirming 24 B.T.A. 599. There need be no formal declaration of a dividend. *Chattanooga Savings Bank* v. *Brewer*, 17 Fed. (2d) 79; certiorari denied, 274 U.S. 751. *Hadley* v. *Commissioner*, 36 Fed. (2d) 543; affirming 6 B.T.A. 1031. The contention of the petitioners is that the transfer was made by the corporation for business purposes to increase the value of adjoining land held by it. This was obviously not the purpose which any of the parties had in mind at the time. If the transfer affected the value of the remaining land, the effect was incidental, unintentional, and not the real purpose of the transfer. The corporation acted solely to accommodate the decedent. At the end of the day the earned surplus of the corporation was reduced by the book value of the land, the trust had the art objects, and the decedent had fully accomplished his sole purpose in having the transfers made. Although it may not be important, it is a fact also that through his absolute dominion over the personal property of the trust, he was in control of the art objects. He enjoyed the use of the corporate property and obtained what he wanted to buy. For income tax purposes the transaction amounted to the distribution of a dividend to the decedent. Cf. *L. J. Christopher*, 13 B.T.A. 729; affd., 55 Fed. (2d) 527.

## IV.

The petitioners contend, under the fourth issue, that the Commissioner erred in failing to allow proper deductions, for each of the three periods here involved, on account of alleged gifts made by the decedent to the Henry E. Huntington Library and Art Gallery. They make this claim under section 214 (a) (10) of the Revenue Act of 1926, which allows as deductions, subject to certain limitations, " contributions or gifts made within the taxable year to or for the use of: * * * any * * * trust * * * organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes * * * no part of the net earnings of

which inures to the benefit of any private shareholder or individual." This contention of the petitioners is closely related to the first issue discussed in this proceeding. Section 214 (a) (10) allows deductions for gifts made within the taxable year. Courts hold that there is no gift unless the donor absolutely and irrevocably divests himself of the title, dominion, and control over the subject of the gift. For a summary of authorities see *Margaret M. Edson*, 11 B.T.A. 621, and the opinion of the Circuit Court of Appeals for the Eighth Circuit, 40 Fed. (2d) 398, reversing the Board. In holding that there was a taxable gift in 1925 within the meaning of section 319 of the Revenue Act of 1924, the Supreme Court in the case of *Burnet* v. *Guggenheim, supra*, stated that:

> Taxation is not so much concerned with the refinements of title as it is with the actual command over the property taxed * * *. While the powers of revocation stood uncanceled in the deeds, the gifts, from the point of view of substance, were inchoate and imperfect. * * * By the execution of deeds and the creation of trusts, the settlor did indeed succeed in divesting himself of title and transferring it to others [cases cited], but the substance of his dominion was the same as if these forms had been omitted. *Corliss* v. *Bowers, supra*. He was free at any moment, with reason or without, to revest title in himself, except as to any income then collected or accrued. As to the principal of the trusts and as to income to accrue thereafter, the gifts were formal and unreal. They acquired substance and reality for the first time in July, 1925, when the deeds became absolute through the cancellation of the power.
>
>       *       *       *       *       *       *       *
>
> * * * a gift is not consummate until put beyond recall.

The alleged gifts were of personal property. This property was not put beyond recall within the taxable year but remained subject to the donor's "absolute dominion." Cf. *Porter* v. *Commissioner, supra; Jackson* v. *Commissioner, supra*. Furthermore, the decedent could take to himself at any time the benefits of the net earnings of the trust property. Thus, for these two reasons, the transfers in question can form no basis for a deduction under section 214 (a) (10) of the Revenue Act of 1926. *First National Bank of Boston, Administrator*, 25 B.T.A. 252.

## A.

Before taking up the petitioners' next assignment of error we will consider the respondent's affirmative claims. The respondent contends that interest in the amount of $16,666.66 should be included in the decedent's income for 1925. This amount was the accrued interest on a million dollars par value of Pacific Electric Railway Co. bonds at the date in 1925 when the bonds, with the coupons attached, were transferred to an art dealer in exchange for pictures. The coupons attached were not due until a later date. The transfers of per-

sonal property which the decedent made to the trust were not gifts, inasmuch as he retained absolute dominion over the property after it was transferred to the trust. See discussion on first and fourth points, *supra*. Thus, the question is whether or not he was in receipt of interest, and therefore income, when he not only transferred the bonds and coupons to the trust but immediately used that personal property to make purchases of other personal property on behalf of the trust. Counsel for the respondent made this claim for an increased deficiency at the hearing by amendment to his answer. Consequently, the burden of proof on this issue is upon him. Board's Rule 30; *S. L. Fowler*, 6 B.T.A. 250. But facts to raise the question fairly are not in the record. The decedent sold other bonds with coupons attached, during the periods before us, and in the transactions received a certain amount of cash which was specifically paid on account of the accrued interest. He reported the amounts received as interest. But here the respondent has not shown the value · of what was received in exchange or that anything was received on account of interest. Cf. S.O. 46, C.B. III, p. 90. Consequently, the question suggested by the respondent is academic only, in so far as this case is concerned. We can not say that error was committed in omitting this item from income for 1925.

### B.

The respondent contends, in case he is sustained on the petitioners' first point, that the deficiency for the period ended May 23, 1927, should be increased because he erroneously failed to disallow a deduction of $419,600 claimed on the return as a loss from the sale of Los Angeles Railway Corporation bonds. Some similar bonds were sold by the decedent to his daughters, but the respondent no longer contends that the loss on those particular bonds was improperly allowed. The facts relating to the transactions in the remaining bonds are clear. On a certain day the decedent sold the bonds at market to the Huntington Land and Improvement Co. On the same day the Huntington Land and Improvement Co. transferred the same bonds at the same price to the Huntington Library and Art Gallery trust in exchange for land. The respondent does not question the effect or the genuineness of the sale by the decedent to the corporation of which the decedent was the sole stockholder. A deductible loss may be sustained through such a sale. *David Stewart*, 17 B.T.A. 604; *Corrado & Galiardi, Inc.*, 22 B.T.A. 847. The only point made by the respondent is that the decedent did not sustain any real loss, since the same bonds which he parted with in the morning were a part of the trust personalty by evening and he had absolute dominion over the trust personalty.

The respondent would apply the provision of section 214 (a)(5) that no deduction shall be allowed for loss claimed to have been sustained in any sale of securities where within 30 days after the date of the sale the taxpayer has acquired substantially identical property and the property so acquired is held by the taxpayer for any period after such sale. The petitioners' briefs are silent in regard to the question thus raised.

The decedent did not personally reacquire substantially identical property and, strictly construed, the language of 214 (a)(5), above referred to, might not apply. However, the rule of strict construction should not be unduly pressed to permit easy evasion of a taxing statute. *Carbon Steel Co.* v. *Lewellyn,* 251 U.S. 501. Unless the respondent is right, a trust like this one could be used deliberately to accomplish the very thing which Congress intended to frustrate. Compare the last paragraph of the opinion in *Reinecke* v. *Smith, supra.* The evidence does not indicate that income tax avoidance was thought of in connection with the particular transactions here in question. But a taxpayer's good intentions are not determinative of his right to a loss deduction. The sale to the corporation and the exchange to the trust were each a part of a single plan conceived and carried out by the decedent. His one desire was that the trust have bonds in place of unnecessary land. The corporation and the trust were his pawns. He completely controlled both and made each act to carry out his plan. But, when his purpose was accomplished, we find that for income tax purposes his one move checkmated the other.

The trust was not a taxpayer. The practical effect of the creation of the trust was to assign income. *Reinecke* v. *Smith, supra.* All of the income of the trust was still taxable to the decedent. His gifts to the trust were so lacking in substance that the gift tax of the Revenue Act of 1924 would not have reached them. They would not support a claim for a deduction under section 214 (a)(10) of the Revenue Act of 1926. It would be anomalous if the acquisition by the trust here shown would not defeat the taxpayer's claim to a deduction under section 214 (a)(5) of that act. The Supreme Court has said repeatedly, " Taxation is not so much concerned with the refinements of title as it is with the actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss* v. *Bowers, supra,* at page 378; *Tyler* v. *United States,* 281 U.S. 497; *Burnet* v. *Guggenheim, supra; Reinecke* v. *Smith, supra.* Likewise, taxation is primarily concerned with the actual reduction of the benefit for which the tax is paid. " Generally speaking, the income tax law is concerned only with realized losses, as with realized gains." *Lucas* v. *American Code Co.,* 280 U.S. 445. Although title to the bonds was acquired by the trust, actual command over the property was still

in the decedent. How can the fact or the amount of his loss be determined while the bonds have value and while he can revest title in himself? If the value of the bonds had subsequently increased, he might even have made a profit on them. We are unable to say that he realized any loss. The difference between acquisition by him personally and acquisition by the trust amounts only to a refinement of title and may be disregarded so far as section 214 (a) (5) is concerned. "The substance of his dominion was the same as if these forms had been omitted." *Burnet* v. *Guggenheim*, *supra*. Cf. *O'Donnell* v. *Commissioner*, *supra*. The alleged loss of $419,600 was not sustained in the period ended May 23, 1927.

## V.

The decedent owned about one third of the outstanding bonds of the Los Angeles Railway Corporation and all of the outstanding bonds of the City Railway Co. The interest on some of these bonds which became due during the periods here in controversy was not reported in the decedent's income tax returns. The Commissioner included this interest in income for the period in which the coupons matured. The petitioners' fifth contention is that this was in error since the decedent, who was on the cash basis, did not actually receive the interest and the corporations did not have the cash with which to pay it. A taxpayer on the cash basis certainly can not, by refusing to present his coupons and collect his interest when it is due, select the year in which he will report that interest. Cf. *Ella C. Loose, Executrix*, 15 B.T.A. 169. The Commissioner has provided by regulations that bond interest is constructively received when the interest coupons mature and are payable and the interest should be reported in that year even though the coupons are not cashed until later. Regulations 69, article 52, and prior regulations. Although this rule should be properly restricted, nevertheless the time for reporting income may not depend upon the whim of a taxpayer. Cf. *Newman* v. *Commissioner*, 41 Fed. (2d) 743. In the normal case we would expect a taxpayer having interest coupons maturing in a certain year to report the interest in his income for that year. What circumstances are there in this case which would justify the failure to report the interest on these particular bonds?

If a debtor is insolvent or obviously unable to pay his interest, it may be under some circumstances that the creditor need not report the interest as income of the year in which the coupons mature. Cf. *American Cigar Co.*, 21 B.T.A. 464, 492; *Marian Otis Chandler*, 16 B.T.A. 1248; *Great Northern Ry. Co.*, 8 B.T.A. 225; aff'd., 40 Fed. (2d) 372; certiorari denied, 282 U.S. 855. These two cor-

porations, however, not only were solvent, but had a considerable surplus. They showed a profit for each year after accruing all of their interest, including the interest in question, as an obligation.

The decedent did not present for payment the coupons on certain of his bonds and did not receive payment of that interest in cash. Yet about two thirds of the bonds of the one corporation were in the hands of the public and the interest on those bonds was paid regularly as it became due. The petitioner regularly presented the coupons from some of his Los Angeles Railway Corporation bonds and actually received the interest. As we have already said, he never presented his coupons on the bonds in question. He made this distinction voluntarily. The petitioners would have us believe that the decedent was making every effort to collect this interest but his efforts were successfully resisted by the corporations. This is difficult to understand in view of the fact that the decedent actually exercised his complete control over both corporations. Bond interest is not in default where the coupons are not presented and payment is not demanded. In 1927 he sold a large block of these bonds for a price which expressly included the accrued interest. He also gave away some of the bonds. After the sales and after the gifts the owners of the bonds regularly collected the interest from the corporations. The decedent obtained some of the interest on his bonds by discounting a note which the corporation gave him on account of interest on these bonds. He did not want the corporations to be in default on their bond interest. His failure to collect the rest of the interest on his bonds seems to have been pretty largely a matter of his own choice. Cf. *John I. Chipley*, 25 B.T.A. 1103.

We are not unmindful of the fact that the corporations did not have on hand sufficient cash or " current assets " to pay all of the coupons when they became due. Cf. *Marian Otis Chandler, supra.* But the decedent was in control of their finances, had not presented his coupons for several years, and, of course, did not need to have the cash on hand if he did not intend to present his coupons. He was making advances to the corporations, and his failure to demand and collect the interest was equivalent to an advance, subject to demand. We must assume that their failure to have the means of payment and his failure to insist upon payment were matters of his own choice, done to suit his own convenience and for his own good purposes. But he cannot thus avoid his own tax liability on this interest. In *John A. Brander*, 3 B.T.A. 231, in discussing constructive receipt, we said:

It was not that the corporation would not pay, but rather he would not receive. This election to give the corporation the temporary use of the amount is an exercise by him of its enjoyment, and this is one of the primary attributes of income.

Nor have we overlooked the fact that these companies had gone through strenuous times prior to the years here involved. However, 1924 was apparently a good year and there was no reason to believe in the taxable years that the corporations were going to fail or that they would be unable to pay the interest to the decedent when he chose to demand it. Whatever the difficulties were, they did not render the corporations insolvent, prevent the payment of the interest on the bonds of the other holders or avert a profit after all of the interest had been accrued. The doctrine of constructive receipt of income by one on a cash basis should be sparingly applied, yet we are unable to say that the evidence justifies a reversal of the Commissioner's determination on the ground that the decedent was not in constructive receipt of this interest. *John A. Brander, supra.*

## VI.

The decedent sold a number of shares of the stock of the Old Dominion Land Co. in 1925 at $100 per share. He had acquired some of these shares before and some after March 1, 1913. The controversy relates to the basis for the computation of gain or loss on the sale of those shares which were acquired prior to March 1, 1913. In making his income tax return for the year 1925 the decedent considered that the cost of those shares was in excess of their value on March 1, 1913, and, therefore, he computed and reported by the installment method a profit on the basis of cost. Furthermore, he stated in that return that the fair market value of the shares on March 1, 1913, was $70 per share. He was familiar with the property, the corporation's activities, and with prices which had been paid for the stock. Later, the corporation had its properties appraised as of March 1, 1913. But thereafter the decedent filed his 1926 return reporting an additional installment of his profit on the basis of cost and stating the March 1, 1913, value to be $70 as before. The Commissioner accepted the basis used and made certain adjustments which are not in controversy. Apparently encouraged by the appraisal, the executors of the decedent now claim that the shares of stock acquired prior to March 1, 1913, had a fair market value on that day greatly in excess of cost. They therefore claim that the decedent had a loss instead of a profit upon the disposition of those shares involved in the 1925 sale which were acquired prior to March 1, 1913. The Commissioner contends that the cost basis used in the returns was proper for all shares then sold.

The petitioners called the two surviving appraisers to show how they made the appraisal and to state that in their opinion the fair

market value of the real estate on March 1, 1913, was the appraised value. The company's property consisted principally of real estate. However, it had a few other assets and the petitioners also offered evidence to show the value of those assets on March 1, 1913. After the appraisal was made in 1926 the books were adjusted to conform and they then showed a book value for the stock on March 1, 1913, of about $249. The petitioners also called as a witness an expert on the valuation and marketing of unlisted securities. He was told to assume certain facts in a hypothetical question, and on the basis of these stated that, in his opinion, the fair market value of the stock on March 1, 1913, was $183 a share. He assumed that the fair market value of the real estate was the amount determined by the appraisers. He was not told of any sales of the stock.

We need not discuss in detail the retrospective appraisal of the land nor the witnesses' valuation of the stock. The evidence shows that the value of the land was always increasing and never decreasing from March 1, 1913, to the date of the sale by the decedent. If the stock was as valuable on March 1, 1913, as the witness states, it must have been worth far more than par at other times both before and after that date. Yet actual sales show quite the contrary. Cf. *Andrews* v. *Commissioner*, 38 Fed. (2d) 55; affirming 13 B.T.A. 651; *Penney & Long* v. *Commissioner*, 38 Fed. (2d) 849; *E. Louis Jacobs*, 20 B.T.A. 529; *H. H. Blumenthal*, 21 B.T.A. 901; *Detroit Trust Co. et al., Executors*, 25 B.T.A. 340; *American Chemical Paint Co.*, 25 B.T.A. 1208. The petitioners did not attempt to present a history of sales of the stock. The respondent's counsel endeavored to bring out at least a part of this history. It does not appear whether or not there were any sales of the stock on or about March 1, 1913. The sales disclosed were rather remote from March 1, 1913. But there were a great many of these sales, and, so far as we know, the stock never sold above par, and only twice at par, one being the sale in controversy, and the other being the sale of a very few shares in 1917. Most of the other sales were made at 70 or below. The book value of the stock was always far in excess of sales prices actually obtained. The property was not selling rapidly in 1913 and even when land sales were booming the stock sold at 70 or below. Earnings based upon cost were not large. Thus, the petitioners rely principally upon the opinion of a witness, while the Commissioner's determination is supported by sales and other facts. Unless there is a fair preponderance of the evidence favoring the petitioners' view, it is our duty to affirm the Commissioner. Here the necessary preponderance is lacking.

## VII.

The petitioners claim a deduction of $12,000 in 1925 as an ordinary and necessary expense paid by the decedent during the taxable year in carrying on a business. The Commissioner disallowed the deduction. The amount represents the total of payments made by the Huntington Land and Improvement Co. to H. S. Cook in 1923, 1924, and 1925. The Huntington Land and Improvement Co. charged this total to the decedent's account in 1925. But the decedent was on the cash basis and proof of payment was essential even if his case were otherwise complete. Cook was not employed by the decedent and rendered no more service directly to the decedent than did any other employee of the Felt Co. Thus the services were not rendered in connection with the decedent's business. The decedent was not obligated to pay Cook. He voluntarily assumed the burden of the expense. At least no necessity for any expenditure by the decedent has been shown. The petitioners rely upon *Lillian M. Goldsmith*, 7 B.T.A. 151, and *Samuel Rottenberg*, 20 B.T.A. 589. Those cases are distinguishable. In each the taxpayer had engaged someone to render services to him. Here the employee was engaged to do no more than to manage properly the business of the corporation. The decedent was only a stockholder of the Felt Co. and can not deduct its ordinary and necessary expenses. Cf. *Dalton* v. *Bowers*, 287 U.S. 404; *Burnet* v. *Clark*, 287 U.S. 410. The corporate entity may not be disregarded. Cf. *Burnet* v. *Commonwealth Improvement Co.*, 287 U.S. 415. The requirements of section 214 (a) (1) of the Revenue Act of 1926 have not been met.

## VIII.

One of the most important questions in this case is whether or not the decedent sustained a statutory net loss in 1924. The figures necessary to a computation of a statutory net loss have been agreed upon. Thus the solution depends upon whether an amount deducted in 1924 as a debt ascertained to be worthless and charged off in that year was properly deducted in that year and whether there was in that transaction a loss which resulted from the operation of a business regularly carried on by the decedent. The decedent did not claim a corporation's loss or a loss upon the disposition or worthlessness of stock. Cf. *Dalton* v. *Bowers, supra; Burnet* v. *Commonwealth Improvement Co., supra; Burnet* v. *Clark, supra.* Although the evidence is not all one way, nevertheless it demonstrates pretty clearly that the decedent was regularly and actively engaged in carrying on a business and the loss resulted from the operation of that business. He was not merely a stockholder. He dominated

a great many corporations. He was the principal officer of most of them. He had his representatives placed in charge of many of these corporations. Either directly or indirectly he controlled their affairs and determined their policies. This was his principal activity. In order to carry on this business he had to acquire stock in the corporations which he desired to operate. The Chesapeake & Ohio Railway Co. was such a one and he had a regular account with a broker for the purpose of increasing and changing his ownership of its stock. This was an incident of his business. The inability of the broker to deliver the stock was an unfortunate circumstance definitely connected with the decedent's business. It necessitated the loan and thus led to the loss. The decedent had to make the loan in order to get his stock and proceed with his business. He could not afford to jeopardize his right to the stock. It was essential to his business. But the loan was not additional cost of his Chesapeake & Ohio stock. It was a separate transaction, the result of which was not dependent upon what he might obtain for his stock. He could not claim a loss in 1921 because there were then probable sources of repayment. He had reason to believe that Gibson might be successful. After three barren years and further investigation he had reasonable grounds to conclude that the balance due was a worthless debt. Other theories on which the loss might or might not form the basis for a statutory net loss need not be discussed.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

ARUNDELL, dissenting: I am unable to agree with the decision on the sixth point treated in the prevailing opinion. The conclusion is there reached that within the meaning of the revenue act the taxpayer and the trust created by him should be treated as substantially identical, and, inasmuch as the bonds sold by the taxpayer (Huntington) were reacquired by the trust within thirty days, the loss may not be deducted. Sec. 214 (a) (5), Revenue Act of 1926.

But the statute itself makes the distinction between trusts and individuals and it took special legislation, viz., subsections (g) and (h) of section 219, to tax the income of a revocable trust to the creator thereof. Valid trusts have long been recognized in this country. The law of trusts is well established. The creator of a trust parts with legal title to the trust property. He does not have legal title to any property acquired by the trust. Legal title to all trust property is in the trustees. They do not hold it as individuals as they would their own property, but only in a new fiduciary capacity which they have been given by the law and the trust deed. Henry E. Huntington was neither a trustee nor a beneficiary of the trust. A

trust, though revocable, is nevertheless a trust until it is revoked. *Langley* v. *Commissioner*, 61 Fed. (2d) 796. See also *Hibbard, Spencer, Bartlett & Co.*, 5 B.T.A. 464, where a number of authorities are cited. Likewise, the Henry E. Huntington Library and Art Gallery trust was a trust as long as the grantor did not destroy it by the exercise of his retained powers over it.

Distinctions between a trust and the grantor must be recognized except as the revenue act constitutionally provides otherwise. Cf. *Warden* v. *Lederer*, 24 Fed. (2d) 233; L.O. 1102, C.B. I-2, p. 50. All of the income of this particular trust for the periods before us must be included in computing the income of the grantor because of specific provisions in the Revenue Act of 1926. These provisions do not require that for all purposes of the act the trust merge into the individual and lose the separate identity which it otherwise has. The distinction between the individual and the trust is recognized not only in the language of section 219, but in the very necessity for such statutory provisions as are contained in (g) and (h). In fact the language of (g) and (h) may deny to this taxpayer the benefit of a loss of this very trust where that loss exceeds all trust income. Trusts are taxpayers, potentially at least. Section 219 requires that trust income be separately computed. Many trusts pay tax. Others must file returns on which no tax is due. Losses of trusts frequently benefit no other taxpayer. Section 219. Section 214 (a) (5) allows a loss deduction except where the *taxpayer* acquires and holds substantially identical property. The taxpayer here did not acquire or hold such property after the sale. The restriction contained in section 214 (a) (5) does not deal specifically with acquisition and holding by some other entity. A broader inhibition should not be read into the act.

MARQUETTE and LEECH agree with this dissent.